**UNITED STATES of America**

v.

**Reuben T. WARD.**

**Crim. No. 729–70.**

United States District Court,
District of Columbia.

Nov. 17, 1971.

Robert A. Shuker, Asst. U. S. Atty., Washington, D. C., for the United States.

Barbara Bowman, Public Defender Service, Washington, D. C., for defendant.

SIRICA, Chief Judge.

## MEMORANDUM

This matter is before the Court on remand from the United States Court of Appeals for the District of Columbia [1] for the purpose of clarifying the reasons given at the original sentencing proceeding for choosing to sentence the defendant Ward under the applicable penalty provision [2] rather than under the Federal Youth Corrections Act.[3]

The defendant, Reuben T. Ward, entered a plea of guilty in this Court to a count charging robbery following a three-week trial with a co-defendant on charges of felony-murder, second-degree murder, armed robbery and robbery which ended in a hung jury. Although he insisted he was innocent, the defendant pleaded guilty to the robbery charge to avoid the risk of another trial for murder, under the authority of North Carolina v. Alford.[4]

At the sentencing hearing held on July 16, 1971, the Court made the following statement:

Defendant Ward is now 21 years of age. As a juvenile, complaints for drunk and robbery were lodged against him. As an adult he was placed on probation for attempted procuring, and in fact he was on probation at the time of the present offense which occurred in February of 1970. Although he has had several arrests, the only convictions I have in the probation report: in December 1967 for being drunk he was placed on probation for an indeterminate period of time. December 1969, for robbery, he was committed to the custody of the Department of Public Welfare for an indeterminate period of time. As an adult, in July 1969, for attempted procuring, execution of one year sentence was suspended and he was placed on probation for two years. Probation is to expire on 9/10/71. Then on 9/10/69, I believe, for disorderly conduct he was fined $18.00.

Now the victim of the robbery in the instant offense was killed under circumstances surrounding the offense which were therefore of a very serious nature. Defendant Ward has apparently been on drugs for sometime. He is not eligible under NARA because the offense was a crime of violence. His choice of companions and activities has been such that he can be characterized as having street corner sophistication. In the Court's opinion, the defendant Ward requires a program of discipline, guidance and control firmer and more strict than provided by the Youth Correction, or Youth Act commitment. The Court will therefore sentence him under the applicable penalty provision rather than under the Youth Corrections Act.

The Court then imposed a sentence of four to twelve years under the robbery count, and added:

The Court will recommend through the probation officer and then to the Director of Prisons that this young man be sent to an institution where they usually send youth offenders such as Petersburg, Virginia, or some institution of that type.[5]

---

1. United States v. Ward, Nos. 71–1654 & 71–1677 (D.C.Cir., Oct. 29, 1971).

2. D.C. Code § 22–2901 (Supp. IV 1971).

3. 18 U.S.C. § 5005 et seq.

4. 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

5. Sentencing Transcript, pp. 10–11.

After a careful review of all materials available to it at the time of sentencing in connection with this case,[6] the Court believes now, as it did on the day of sentencing, that this particular defendant, Reuben T. Ward, will not benefit from treatment under the Federal Youth Corrections Act.[7] The reasons for this conclusion given at the sentencing hearing and elaborated upon in this memorandum shall constitute an affirmative finding to that effect.

In recommending that the Director of the Bureau of Prisons consider confining the defendant at Petersburg, Virginia, or a similar institution, the Court did not intend to implicitly find that the defendant would benefit from treatment under the Youth Corrections Act. Rather, the Court has made it a practice in many cases, when it has determined that a defendant would not benefit from Youth Act treatment, to recommend confinement in an institution best suited to handle persons of that age group. It seems consistent to find against treatability under the Act, yet recommend the best possible institution for incarceration under the adult penalty provision.

While technically eligible for commitment under the Youth Corrections Act,[8] this defendant's prior experience with youth-oriented rehabilitative programs indicates that he would not benefit from commitment to another such program under the Act. An analysis of the defendant's record,[9] both as a juvenile and as an adult, in the four years prior to the offense in the instant case, reveals a number of contacts with the authorities and a fairly continuous involvement in programs designed to assist him in making a proper social adjustment, including commitment to the Department of Public Welfare's Children's Center and juvenile probation. Not only is the *length of time* which the defendant spent in the various programs noteworthy for our purposes here, but the *number of times* he was committed also indicates a certain dilution of the effect of a youth offender program upon this defendant. Significantly, the defendant was arrested for the very serious charges in the instant case while he was on probation for another charge seven months earlier.[10]

Defendant Ward was initially committed to the Department of Public Welfare in 1966, recommitted to the Department in 1968, and recommitted once more in September of 1969, five months before the offense in this case. Actually, he was concurrently committed to the Department of Public Welfare and on probation when the instant offense occurred. Shortly after this offense, the Social Worker at the Children's Center, a person who would certainly have more than a superficial knowledge of Ward's case history, recommended that his commitment to the Department be set aside. In making the recommendation, she remarked:

Rubin [*sic*] has failed to respond to or cooperate with our supervision of him. He has moved from his family and shows resistance of their efforts to assist him. He is on probation for two years following a charge heard before an adult court [attempted procuring, July 1969]. He is currently detained, awaiting trial on another offense in adult court [the charges in the instant case].[11]

6. See attached Appendix.

7. 18 U.S.C. § 5005 et seq.

8. 18 U.S.C. § 5010(b) predicates eligibility for commitment under § 5010(b) or (c) upon the court's finding that convicted person is a youth offender, and that the offense is punishable by imprisonment under other applicable provisions of law. 18 U.S.C. § 5006(e) defines youth offender as a person under the age of twenty-two years at the time of conviction.

9. A summary of the defendant's juvenile court probation file is contained in the attached Appendix.

10. Defendant was arrested on the charges in the instant case on February 20, 1970. At that time, he was on probation which had been ordered September 11, 1969 for attempted procuring in July 1969.

11. Request for Set Aside of Commitment, submitted by Betty A. Mack, Social Worker, Children's Center, dated February 25, 1970, p. 2. This paper is included in the attached Appendix.

The Court does not question the need of this defendant for a program of guidance and control directing him toward permanent improvement. However, the nature of the most recent offenses of this defendant, his choice of companions and his response toward commitment to the Department of Public Welfare and probation does not suggest Youth Act commitment as the proper method of dealing with his situation. On the contrary, his criminal behavior as demonstrated in the previous offense of attempted procuring and the involvement in the offense here, exhibits a certain sophistication which weighs against his commitment under the Youth Corrections Act.

In December of 1970, Mr. M. R. Montilla, the Acting Director of the District of Columbia Department of Corrections, replied to the inquiry of Judge Gerhard A. Gesell of this court as to what type of defendant, eligible agewise, was considered most desirable, what type undesirable, for treatment under the Act:

Defendants whose criminal activity has apparently resulted from an inability to attain desired ends because of a lack of economic, educational or social opportunity—but whose aberrant behavior is not firmly entrenched —are most suitable to the Youth Center program. *On the other hand, those whose criminality is the result of serious psychological aberations, those who are criminally sophisticated and those who will require long-term incarceration are considered undesirable for commitment under the Act.* * * *[12]

(Emphasis added.)

This Court believes that commitment of this particular defendant to treatment under the Federal Youth Corrections Act would be ill-suited to his needs and violative of the rights of other members of the community who certainly might expect that their interests also be served by the Court's judgment and commitment. Our unfortunate experience has been that Youth Act defendants are too often returned to society prematurely from a rehabilitative program not designed for their particular type or degree of criminal conduct with a resulting resumption of their aberrant behavior.

## APPENDIX

Included herein are materials which were available to the Court, in addition to the Presentence Report, at the time of the sentencing proceeding.

I. Reuben T. Ward—Juvenile Court Probation File (Summary)

II. Request for Set Aside of Commitment, submitted by Betty A. Mack, Social Worker, Children's Center, dated February 25, 1970.

III. Letter of Honorable Gerhard A. Gesell, United States District Court for the District of Columbia, to Mr. Kenneth L. Hardy, Director of the District of Columbia Department of Corrections, December 4, 1970.

IV. Letter of M. R. Montilla, Acting Director of the District of Columbia Department of Corrections to the Honorable Gerhard A. Gesell, United States District Court for the District of Columbia, December 29, 1970.

12. Letter of M. R. Montilla, Acting Director of the District of Columbia Department of Corrections to the Honorable Gerhard A. Gesell, United States District Court for the District of Colum- bia, December 29, 1970, p. 3. This letter and Judge Gesell's letter of inquiry of December 4, 1970, are appended to this memorandum in their entirety.

Reuben T. Ward
Juvenile Court Probation File

9/23/61 – 1 p. m.—Zoo Park—Unlawful Entry—Filed by Youth Division, M.P.D.

3/10/64 – 10:45 a. m.—Zoo Park—Truant—Filed by Youth Division, M.P.D.

7/25/64 – 4 p. m.—3500 Williamsburgh Lane, N. W.—Petit Larceny—Warned by Youth Division, M.P.D.

4/ 5/65 – 1:45 a. m.—2400 blk Lawrence St., N. E.—Anti-Loitering—Indexed by Youth Division, M.P.D.

5/24/65 – 11:30 a. m.—2000 Florida Ave.—Truant—Filed by Youth Division, M.P.D.

Same date – 2:42 p. m.—3330 Garfield St., N. W.—Truant—Retained by Youth Division, M.P.D.

4/15/65 – Truancy

5/17/65 – Continued subject to call of P.O. for disposition.

6/20/65 – 7:55 p. m.—12th and S St., N. W.—Apprehended on roof of school—Indexed by Youth Division, M.P.D.

1/24/66 – Committed to Department of Public Welfare for indeterminate period.

1/ 9/67 – Commitment set aside.

5/ 9/67 – 3:15 p. m.—7th & R. I. Ave. N. W.—Disorderly—Filed by Youth Division, M.P.D.

9/28/67 – 1:30 a. m.—1900 blk 14th St., N. W.—Anti-Loitering—Filed by Youth Division, M.P.D.

10/10/67 – 3 a. m.—3558 13th St., N. W.—Anti-Loitering—Filed by Youth Division, M.P.D.

11/ 1/67 – 2:15 a. m.—17th and Corcoran St., N. W.—Drunk & Disorderly (cursing & swearing). Petitioned 11/3/67—Case closed without a finding 3/19/68.

12/14/67 – 11:58 p. m.—1701 V St., N. W.—Drunk & Disorderly (cursing & swearing). Petitioned 12/18/67.

12/20/67 – placed on probation for indeterminate period of time.

1/28/68 – 8 p. m.—2400 blk 14th St., N. W.—Assault (Simple)—Assaulted Gwendolyn Robinson—N/F/14—Not petitioned 3/26/68.

2/28/68 – 2:15 p. m.—Robbery (F & V)—1107 11th St., N. W.—With group of 8 beat and robbed Warren W. Schlafke W/M/39 of $90.00 and who was treated at Washington Hospital Center for cuts and bruises about face and body.

3/19/68 – Recommitted to Department of Public Welfare.

12/20/68 – placed on probation.

9/ 5/69 – Commitment to Department of Public Welfare continued for indeterminate period.

3/18/70 – Commitment set aside and discharged from jurisdiction of Court.

## REQUEST FOR SET ASIDE OF COMMITMENT

DATE OF COMMITMENT: 3–19–68 JC#: 67–3977–J CWD#: T–34–669.2

NAME OF CHILD: Rubin T. Ward AKA BORN: 5–2–50 RACE: Negro
Reuben Tyler Ward

FATHER: Maurice Ward ADDRESS: Deceased

MOTHER: Lorraine Johnson ADDRESS: 4508 Quarles St., N. E.

STEP-FATHER: William Johnson ADDRESS: 4508 Quarles St., N. E.

DATE OF LAST CONTACT AND WITH WHOM: 1–26–70, mother.

COURT HISTORY: 1–24–66 – Committed to the Department of Public Welfare for an indeterminate period.

1–9–67 – Commitment set aside.

3–19–68 – Recommitted to the Department of Public Welfare for an indeterminate period.

9–5–69 – Commitment continued for an indeterminate period.

---

### REASON FOR COMMITMENT:

Rubin was recommitted to the Department of Public Welfare, 3–19–68 because of involvement in a complaint of Robbery, Force and Violence.

### SUMMARY OF ADJUSTMENT UNDER CARE:

Following recommitment, Rubin was placed at Children's Center. He adapted readily to institutional living, having had a previous placement at the Center. He showed little motivation to perform in the academic setting, initially. After some improvement, he was placed in the furniture repair class where he did well.

Contacts between Rubin and his family were maintained through letters and his visits to the home. On October 13, 1968 Rubin failed to return from a weekend home visit. At his mother's insistence, he returned on 10–19–68. His mother refused to visit him and denied him home visit privileges until February 1969.

In December 1968, Rubin was placed on a paid work detail where he remained throughout his stay. Subsequent home visits went well and he was released to his mother on 5–19–69. He registered for employment at USES. In the home lives his mother, step-father and three younger half-siblings. They reside in a NCHA apartment in the Kenilworth section. Mrs. Johnson works daily as a domestic. Mr. Johnson is retired, on disability status and assumes responsibility for the home daily. Rubin showed resentment for his step-father's supervision and on one occasion was involved in an altercation with Mr. Johnson.

Rubin was not successful in finding employment immediately. On 6–30–69 he was accepted as a case aide trainee and scheduled to learn "on the job" with Children's Center Social Service. He expressed interest in this program, but experienced attendance difficulties. Efforts to help Rubin with transportation

Re: Rubin T. Ward AKA Reuben Tyler Ward

and clothing needs did not help him improve his attendance.

On 7–16–69 Rubin was charged in a complaint of Attempted Procuring. This case was heard in the Court of General Sessions and he was sentenced on 9–11–69 to one year in jail, which was suspended and he was placed on two years probation.

Since Rubin dropped out of the case aide training program, he has not been cooperative with our services. He has failed to reveal his daily activities and has shown no willingness to cooperate. In November, he moved to 1907 15th St.,

N. W. He will not give information regarding his living situation and cannot point to visible means of support. Mrs. Johnson says that her son will not divulge his activities to her, either.

Mr. Ostraw, Probation Officer for Rubin, says that he continues to be on probation and will remain so until 9–10–71.

On 2–21–70 Rubin was placed in District Jail on a charge of Murder, First Degree and remains there to date.

REASON FOR REQUEST FOR SET ASIDE:

Rubin has failed to respond to or cooperate with our supervision of him.

He has moved from his family and shows resistance of their efforts to assist him. He is on probation for two years following a charge heard before an adult court. He is currently detained, awaiting trial on another offense in adult court.

RECOMMENDATION:

It is therefore recommended that Rubin's commitment to the Department of Public Welfare be set aside.

[s] Betty A. Mack, Social Worker
Children's Center

BAM/lgh/2–25–70

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
WASHINGTON D. C. 20001

CHAMBERS OF
GERHARD A. GESELL
UNITED STATES DISTRICT JUDGE December 4, 1970

Mr. Kenneth L. Hardy
Director
Department of Corrections
614 H Street, N. W.
Washington, D. C.

Re: Youth Correction Act Commitments for Title 22 Offenses

Dear Mr. Hardy:

A recent decision of our Court of Appeals indicates that judges of our court who fail to sentence defendants under 22 years of age under the Youth Correction Act must state the reasons for their action. This development prompts me to write you to obtain officially certain information which appears to bear on this general subject. Attached to this letter you will find a series of questions and I will appreciate your furnishing the information to me as promptly as possible. In the event you do not have precise records, your best estimate will suffice.

I am sorry to add to the burden of your job and if there is some official who can supply the answers, this will be satisfactory.

Cordially yours,

(s) Gerhard A. Gessel

cc: Mr. George W. Howard
 Probation Officer

December 4, 1970

Re: Youth Correction Act commitments for Title 22 offenses.

(1) What is the median or average length of incarceration for defendants committed under 5010(b), broken down by particular type of offense?

(2) What is the median or average length of incarceration for defendants committed under 5010(c), broken down by particular type of offense?

(3) What is the recidivism rate, by type of offense?

(4) What is the recidivism rate, by age of offender at time of original offense?

(5) What is your present and expected census of occupancy?

(6) How many defendants committed under the Youth Correction Act are sent by Correction authorities to adult prisons, such as Lorton?

(7) What percentage of 5010(e) commitments are handled at the Jail rather than at the Youth Center?

(8) What is meant by the recommendation frequently received in 5010(e) reports that defendant be released at initial interview?

(9) What is the correctional policy as to length of incarceration for a defendant committed under 5010(c) as opposed to a commitment under 5010(b) for the same offense?

(10) What type of defendant eligible by age for commitment under the Youth Correction Act is considered undesirable for commitment under that Act and what type of defendant is most desired?

## GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF CORRECTIONS
Suite 1114
614 H Street, N. W.
Washington, D. C., 20001

Office of The Director

December 29, 1970

The Honorable Gerhard A. Gesell
United States District Court
For the District of Columbia
Washington, D. C. 20001

RE: Youth Corrections Act Commitments for Title 22 Offenses

Dear Judge Gessell:

This is in reply to your correspondence of earlier this month concerning the above-captioned subject. I trust that this information will assist in the court's handling of defendants who might be sentenced under provisions of the Youth Corrections Act. I am listing the data in the sequential order as posed by your questions, except where points are otherwise combined.

(1)/(2) The median length of incarceration for men committed under 5010 (b) and 5010(c) is approximately twelve (12) months. Sentences are not categorized in accordance with particular types of offenses. Rather, we gear treatment goals to the individual needs of each man and as these goals are obtained we consider the man for release from the institution. Prior to discharge from custody, each inmate is required to make a

significant progress toward academic, vocational, social and therapy objectives.

(3)/(4) In November, 1970, our Research Division compiled a report concerning the performance and rates of recidivism of Youth Act cases who have returned to the community during the period of 1965–69. A detailed breakdown regarding recidivism rate by type of offense and by age of offender at time of original offense is not available. However, the average Youth Act commitment is 19½ years old at the time he comes to us and our current trend for all commitments shows a recidivism of 25% over a two year follow up. Our research indicates that this is relatively low compared with other youthful offender populations recently reported in correctional literature.* We are also encouraged by a downward trend in this rate which has been shown during the past year as has perhaps been caused by a closer integration of institutional and community treatment.

(5) The Youth Center's present maximum capacity is rated at 340; its current population is close to 400. No significant change in population is anticipated in the immediate future. We are proceeding with plans to convert an existing facility at Lorton into a second Youth Center. This facility will handle an additional 250 inmates and will be available for occupancy within six (6) months following the allocation of funds, which have not yet been appropriated.

(6) The D. C. Department of Corrections commits all defendants who have Youth Corrections Act sentences to the Youth Center. If they escape from the Youth Center or if behavior is constantly disruptive so as to cause undue disruption to operations, they are transferred to another institution. Simultaneously, such transfers are accompanied with a request to the Federal Bureau of Prisons that they be transferred to a Federal Youth Center. During the past calendar year, seventeen Youth Corrections Act offenders have been transferred from the Youth Center. Of these, twelve (12) were returned to the Youth Center.

(7) At present, no 5010(e) commitments are handled at the D. C. Jail. During the spring of 1970, we processed several of these cases at the jail, however, on an emergency basis due to serious over-crowding at the Youth Center. Studies under such circumstances are not the best procedure and we do not contemplate that we will be compelled to adopt this procedure in the future.

(8) In certain cases the Youth Center staff recommends commitment under the Youth Corrections Act with a statement that the defendant be considered for release from the institution at the time of his initial parole hearing (initial interview). The Youth Act requires that the Parole Board conduct an interview of each sentencee within 60 days of commitment. Recommendations for release from the institution following the initial hearing are made for the reason that some sentences can benefit more from a period in our Community Treatment Center and through an intense parole supervisory experience than through extended incarceration. Our 5010(e) studies include reasons for recommendation for placement onto probation.

(9) Our policy is to review the individual needs of each man sentenced under the Youth Corrections Act and to tailor treatment goals to meet these needs. The duration of incarceration is based directly on the men reaching these goals and is not specifically related to the length of sentence as under sections 5010(b) or 5010(c).

(10) The Youth Center is an institution designed to provide resources and opportunities which enable a youth to improve his academic standing, develop a marketable skill and to deal with the emotional problems which he presents. The overwhelming majority of our population comes from the inner city areas of the District of Columbia; therefore, programs are designed for this population. The defendant considered most de-

* See attached Research Report No. 21.

sirable in terms of rehabilitative potential is one who comes from and will be returning to the District of Columbia for which our programs are focused. Defendants whose criminal activity has apparently resulted from an inability to attain desired ends because of a lack of economic, educational or social opportunity—but whose aberrant behavior is not firmly entrenched—are most suitable to the Youth Center program. On the other hand, those whose criminality is the result of serious psychological aberrations, those who are criminally sophisticated and those who will require long-term incarceration are considered undesirable for commitment under the Act. Included in this category are the serious sex offender, the pervert and the mentally retarded. Also broadly included would be the "white collar" criminal and the political offender (draft dodger).

We encourage the continuation of 5010 (e) commitments where there is some question of suitability for the Youth Corrections Act or other dispositions.

Sincerely,

[s] M. R. Montilla
Acting Director

cc: Mr. George Howard
 Chief, Probation Office, U. S.