UNITED STATES of America

v.

**Conrad S. DANCY, Appellant**
**(two cases).**

**Nos. 71–1856, 72–1452.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1973.

Decided Jan. 2, 1975.

Carol Garfiel Freeman, Washington, D. C. (appointed by this Court), for appellant.

Stuart M. Gerson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, John A. Terry, Asst. U. S. Atty., and Vincent R. Alto, Asst. U. S. Atty. at the time the brief was filed, were on the brief, for appellee.

Before BAZELON, Chief Judge and LEVENTHAL and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

Appellant, Conrad Dancy, was convicted on September 23, 1971 of first degree

felony murder[1] and other lesser offenses,[2] stemming from the shooting death of William Darden on July 6, 1970.[3] Since Dancy was under 22 years of age at the time of conviction, he was eligible to be considered for sentencing to a youth treatment facility under the Federal Youth Corrections Act (FYCA).[4] To assist him in his sentencing decision, the trial judge elected, pursuant to 18 U.S.C. § 5010(e), to commit Dancy to a sixty day study and evaluation at the Lorton Youth Center.[5] The resulting report recommended that Dancy be denied FYCA sentencing and be given an adult sentence. Relying on that recommendation, the trial judge sentenced Dancy to an adult term of imprisonment of twenty years to life on the first degree murder count and to lesser concurrent terms on the other counts.

Dancy appealed both the conviction and the denial of FYCA sentencing. In a memorandum opinion issued on January 29, 1974, we disposed of all claims relating to his conviction.[6] At the same time we stayed consideration of the FYCA issues raised by the case pending the Supreme Court's decision in Dorszynski v. United States. *Dorszynski* now having been decided, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), we proceed to an examination of those issues, and, based on that examination, remand the case for resentencing.

I

Enacted in 1950, the Federal Youth Corrections Act was a Congressional response to the fact that persons between the ages of 18 and 22 were proportionately far over-represented in national crime statistics.[7] It was thought that psychological and physiological factors created a special propensity in persons in that age bracket to engage in criminal

1. 22 D.C.Code § 2401.

2. The lesser offenses were second degree murder (22 D.C.Code § 2403), attempted robbery while armed (22 D.C.Code §§ 2902, 3202), and carrying a pistol without a license (22 D.C.Code § 3204).

3. Testimony at trial indicated that on July 6, 1970 William Darden, his eight year old daughter, a woman named Christine Tyson and several of her children were en route in Darden's car from North Carolina to Darden's home in New Haven, Connecticut. They drove into the District of Columbia sometime in the early morning hours and stopped at the Bar 20 Carryout on Kenilworth Avenue, N.E. Darden entered the carryout alone. As he bought some food, a Mr. Henson approached and asked him for a quarter. When Darden refused, Henson left the carryout. On leaving, Henson saw Dancy who was standing outside with some companions. Henson asked Dancy what he was doing in the area. Dancy replied that "he was trying to make some money." Henson also heard Dancy say that "he went down to make some money and he was going to rob a man." During this conversation, Darden left the carryout, went to his car, reentered the carryout and returned once again to his car. While sitting in his car, Darden was approached by Dancy who put a gun to his head. Darden got out of the car and exchanged words with Dancy. Dancy pushed Darden out of the way and backed to the street. Darden followed, whereupon Dancy shot him.

4. 18 U.S.C. §§ 5005–5026.

5. The trial judge noted that the commitment was "for a further study and analysis so far as psychological and psychiatric circumstances and whether or not the defendant can benefit from the provisions of the Youth Corrections Act in the event that should serve to be the answer."

6. In that opinion we rejected Dancy's challenges to his first degree murder conviction and his conviction for carrying a pistol without a license. We vacated his sentence on the second degree murder conviction on the basis of Fuller v. United States, 132 U.S.App. D.C. 264, 407 F.2d 1199, 1233 n. 52 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). We also vacated his conviction for attempted robbery while armed since it was the underlying felony of his felony murder conviction. United States v. Greene, 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974).

7. The House of Representatives Judiciary Committee Report on the proposed Federal Youth Corrections Act indicated that "[p]ersons 16 to 23, inclusive [the age to be covered by the proposed Act] constitute 20 percent of our population above the age 15 (based on 1940 census figures) but they are responsible for 47.3 percent of our robberies; they constitute 55.4 percent of our apprehended burglars, and 63.1 percent of our automobile thieves." H.R.Rep.No.2979, 81st

activity.[8] Congress thought it possible to steer many of these young offenders away from a continued life of crime, believing that "young persons . . . convicted of crime have, as a general rule, a higher potential for being rehabilitated to become useful citizens than do older, more mature offenders."[9] In order to realize that potential, the FYCA provides that eligible young offenders be committed to specially established rehabilitative facilities, there to receive "essential varieties of treatment."[10] Such facilities provide the added benefit—also contemplated by the Act—of insuring that young offenders are not intermixed in their institutionalization with hardened adult criminals.[11]

The sentencing alternatives available to a trial court under the FYCA are set out in 18 U.S.C. § 5010. If commitment is unnecessary, the trial judge may place the youth offender on probation. Other-

wise, he may sentence the youth to the custody of the Attorney General for treatment under the Act.[12] Finally, if the trial judge finds that "the youth offender will not derive benefit from [Youth Corrections Act] treatment," he may "sentence the youth offender under any other applicable penalty provision [i. e. he may sentence him as an adult]."[13]

In order to insure that the trial judge's sentencing decision be an informed one, Congress wisely provided in § 5010(e) of the Act that "[i]f the court desires additional information as to whether a youth offender will derive benefit from treatment [under the Act] . . . it may order that he be committed . . . for observation and study at an appropriate classification center or agency" and that "[w]ithin sixty days from the date of the order . . . the [Youth Services] Division shall report to the court its findings."

Cong., 2d Sess., 2, U.S.Code Cong. Serv. News, 1950, p. 3984. More current statistics continue to show this disproportionality. In 1973, 22 percent of the arrests for violent crimes were of persons between the ages of 18 and 22—the ages covered by the enacted FYCA—while that age bracket represents only 7% of the American population. Crime in the United States, 1973 FBI Uniform Crime Reports at 128–29.

8. "Sociologists and psychiatrists tell us that special causations which occur in the period between adolescence and manhood are, in a large measure, responsible for antisocial conduct trends manifested by persons in that age group." H.R.Rep.No.2979, 81st Cong., 2d Sess., 2, U.S.Code Cong. Serv. 1950, p. 3984.

9. United States v. Waters, 141 U.S.App.D.C. 289, 291, 437 F.2d 722, 724 (1970).

10. 18 U.S.C. § 5011. "Treatment" is broadly defined in the statute as "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders". 18 U.S.C. § 5006(g). The treatment actually provided in Youth Act facilities such as the Lorton Youth Center includes educational and vocational training as well as some psychiatric and psychological counseling. In a letter to the District Court, the Director of the D.C. Department of Corrections explained that:

The Youth Center is an institution designed to provide resources and opportunities

which enable a youth to improve his academic standing, develop a marketable skill and to deal with the emotional problems which he presents.

United States v. Ward, 337 F.Supp. 185, 193 (D.D.C.1971).

11. 18 U.S.C. § 5011. The FYCA also provides that when a youth offender sentenced under its provisions is discharged "before the expiration of the maximum sentence imposed upon him, the conviction shall be automatically set aside." 18 U.S.C. § 5021. This promise of expungement is an important one. "The stigma of a criminal conviction may itself be a greater handicap in later life than an entire misspent youth." Bazelon, Racism, Classism, and the Juvenile Process, 53 Judicature 373, 373 (1970).

12. As for duration of treatment, the Act provides two alternatives. If sentenced under 18 U.S.C. § 5010(b), a young offender must be unconditionally discharged no later than six years after the date of his conviction. 18 U.S.C. § 5017(c). If 18 U.S.C. § 5010(c) is invoked by the trial judge, the six year ceiling does not apply and unconditional discharge can occur any time up to "the expiration of the maximum sentence imposed, computed uninterruptedly from the date of conviction." 18 U.S.C. § 5017(d).

13. 18 U.S.C. § 5010(d).

The classification center ordinarily used for young offenders convicted in the District of Columbia is the Lorton Youth Center. There the conduct of the § 5010(e) study is the responsibility of a Youth Center Classification Committee. The Committee is composed of a clinical psychologist and a Classification and Parole Officer and is chaired by the Administrator of the Diagnostic Unit of the Youth Center.[14] The Classification and Parole Officer is responsible for compiling a classification study reviewing the circumstances of the offense in question, the offender's social and family background and the quality of his relationship with the staff while at the Center. He may conduct interviews not only with the offender but also with his family and community associates. The clinical psychologist compiles a personality profile of the offender, based on interviews with him and certain projective and intelligence tests. The three Classification Committee members prepare a joint evaluation and recommendation. This evaluation and recommendation, along with the individual reports of the Classification and Parole Officer and the clinical psychologist and a cover letter from the Superintendent or Assistant Director of the Youth Center are forwarded to the D.C. Board of Parole. Based on this material, the Board makes its own recommendation and submits the entire package of documents, the completed § 5010(e) study, to the court.

## II

The implementation of the sentencing provisions of the FYCA has been the subject of much litigation in this and other Circuits.[15] Last Term, the Supreme Court addressed the area for the first time in Dorszynski v. United States.[16] In that case, a young man of 19 had been found guilty of possessing a controlled substance without a prescription. Although trial counsel requested that the defendant be "placed on probation under the Youth Corrections Act", the trial judge sentenced the defendant to an adult term without ordering a § 5010(e) study and evaluation and, indeed, without making any reference at all to the FYCA. The Supreme Court remanded the case for resentencing. It held—as this court had before [17]—that before a trial judge may sentence a youth offender to an adult term he must make an *explicit* finding that the eligible youth will "not benefit" from FYCA treatment. However, the Supreme Court also indicated that, in giving an adult sentence, the trial judge is not required to give a statement as to the reasons which underlay his finding of "no benefit." [18] The Court stated that the FYCA was intended "to preserve unfettered the sentencing discretion of federal district judges",[19] and the only purpose of requiring a statement of reasons would be "to facilitate appellate supervision of, and thus to limit, the trial court's sentencing discretion." [20]

14. The outline provided here of the § 5010(e) process is based largely on the written responses of the Assistant Director of the D.C. Department of Corrections to questions posed by the trial court in United States v. Tillman, 374 F.Supp. 215 (D.D.C.) (responses filed Jan. 2, 1974). *See also* United States v. Phillips, 156 U.S.App.D.C. 217, 479 F.2d 1200, 1203 (1973).

15. *E. g.,* United States v. Coefield, 155 U.S. App.D.C. 205, 476 F.2d 1152 (1973) (*en banc*); Williams v. United States, 476 F.2d 970 (3d Cir. 1973); Brooks v. United States, 497 F.2d 1059 (6th Cir. 1974); Cox v. United States, 473 F.2d 334 (4th Cir. 1973).

16. 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

17. United States v. Coefield, 155 U.S.App.D.C. 205, 476 F.2d 1152, 1156 (1973) (*en banc.*)

18. Prior to *Dorszynski* this circuit had required that a statement of reasons accompany a trial judge's finding of "no benefit." United States v. Reed, 155 U.S.App.D.C. 198, 476 F.2d 1145, 1149–1150 (1973); United States v. Coefield, 155 U.S.App.D.C. 205, 476 F.2d 1152, 1157 (1973).

19. Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 3050, 41 L.Ed.2d 855 (1974).

20. *Id.* at 3052. The four justices who joined in a separate opinion concurring in the result reached by the majority point to several policies other than the "facilitat[ion of] appellate supervision" that, according to them, would be served by a statement of reasons. They assert that such a statement might a) "con-

The Court was careful to point out in *Dorszynski*, however, that appellate courts do have a limited role to perform in the sentencing area.[21] In noting that the appellant made no contention that "the District Court relied upon improper or inaccurate information",[22] the Court cited United States v. Tucker.[23] In so doing, the Court reaffirmed the established doctrine that appellate courts have a duty to scrutinize sentencing decisions to insure that they are not based on information that is false or otherwise improper.[24]

■ The Court was also careful to distinguish between "appellate modification of a statutorily-authorized sentence"[25] and "careful scrutiny of the *judicial process* by which the particular punishment was determined."[26] While the former is generally inappropriate, the latter is "on the contrary, a necessary incident of what has always been appropriate appellate review of criminal cases."[27] Careful appellate review of the judicial sentencing process does not impinge upon the trial judge's discretion to impose sentence within statutory limits.

tribute to rationalizing the sentencing process . . . [by] encourag[ing] the judge to clarify and justify, in his own mind, the grounds for the sentence he chooses"; b) aid "correctional authorities in their handling of the prisoner after sentence"; c) "aid the defendant's counsel to insure that the sentence is not premised on misinformation"; and d) "contribute to the offender's rehabilitation by avoiding any feeling that his sentence was arbitrary." *Id.* at 3058–3059 (Marshall, J., concurring in the result). *See* M. Frankel, Criminal Sentences, Law Without Order 39–49 (1972); R. Goldfarb & L. Singer, After Conviction 190–95 (1972).

21. This court has recently recognized that role in United States v. Allen, 166 U.S.App.D.C. ——, 510 F.2d 651 at 652–653 (1974).

22. Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 3047 n. 7, 41 L.Ed.2d 855 (1974).

23. 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

24. *See* Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); United States v. Latimer, 415 F.2d 1288 (6th Cir. 1969); *see also* Coleman v. United States, 123 U.S.App.D.C. 103, 357 F.2d 563 (1965) (*en banc*).

Rather, it simply aims to guarantee that the trial judge's sentencing discretion is actually exercised[28] and that the information relied upon by him is not unreliable,[29] improper,[30] or grossly insufficient.[31]

Staying well within the bounds of the appellate role described in *Dorszynski*, we conclude for reasons detailed in III, *infra*, that Dancy's case must be remanded for resentencing.

## III

### A

In sentencing Dancy to an adult term, the trial judge commented as follows: "This court is of the opinion that in view of the fact that the Youth Center itself has indicated that sentencing him as a youth would not be the proper procedure and that they would not be able to supply the needs that he has; and although the Court recognizes that mere incarceration may not be rehabilitative, *nevertheless, the Court has no alternative under the statute.*" (Sent. Tr. 4–5). (emphasis added)

25. Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974) *quoting from* United States v. Hartford, 489 F.2d 652, 654 (5th Cir. 1974).

26. *Id.* (emphasis in original).

27. *Id.*

28. *See* United States v. McCoy, 139 U.S.App. D.C. 60, 429 F.2d 739 (1970); Briscoe v. United States, 129 U.S.App.D.C. 146, 391 F.2d 984 (1968).

29. Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

30. Scott v. United States, 135 U.S.App.D.C. 377, 419 F.2d 264, 266 (1969); *see also* United States v. Wiley, 267 F.2d 453 (7th Cir. 1959).

31. *See* Leach v. United States, 118 U.S.App. D.C. 197, 334 F.2d 945 (1964); *see* ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences § 3.2(ii) (1968) ("The authority of the reviewing court with respect to the sentence should specifically extend to review of . . . the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based.").

The trial judge evidently believed that the statute barred him from sentencing Dancy to a youth term against the recommendation of Youth Center officials. This apparent surrender of discretion and responsibility to the Youth Center authorities is fundamentally at odds with the demands of traditional sentencing doctrine that requires the trial judge to exercise his statutory discretion.[32] More importantly, the trial judge's claim that he had "no alternative" is manifestly inconsistent with the provision of the FYCA which places the responsibility both for making a finding of "no benefit" and for making the sentencing decision attendant thereto on the trial court alone: *"If the court* shall find that the youth offender will not derive benefit . . . *then the court* may sentence the youth offender under any other applicable penalty provision."[33]

While a § 5010(e) report is a potentially useful pre-sentencing aid, it is designed only to provide "additional information as to whether a youth offender will derive benefit from treatment."[34] The trial judge may accept the recommendation of the § 5010(e) report. But he is also free to reject it. In order to make an informed sentencing decision he may require a detailed explanation of the report, seek its supplementation with further information and/or inquire into the manner of its preparation.[35]

B

The recommendation of the Youth Center's § 5010(e) Classification Committee reveals another deficiency in the manner in which Dancy was sentenced. That recommendation—which the trial judge apparently believed al-

---

**32.** United States v. McCoy, 139 U.S.App.D.C. 60, 429 F.2d 739 (1970); Briscoe v. United States, 129 U.S.App.D.C. 146, 391 F.2d 984 (1968).

**33.** 18 U.S.C. § 5010(d) (emphasis added). Nor does the trial judge's apparent surrender of his discretion to Youth Center authorities find any support in *Dorszynski*. "Literal compliance with the [FYCA's 'no benefit' requirement] can be satisfied by any expression that makes clear *the sentencing judge* considered the alternative of sentencing under the Act and decided that the youth offender would not derive benefit from treatment under the Act." Dorszynski v. United States, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974) (emphasis added).

The "no alternative" language is not the only shortcoming in the sentencing proceeding. Nowhere in the sentencing transcript is there any explicit finding by the trial judge—as required by *Dorszynski*—that Dancy will not benefit from Youth Act treatment. In summarizing the § 5010(e) and presentence reports, it is true that the trial judge mentioned—without explicitly adopting—their negative conclusions that "Dancy is not an appropriate person for the benefits of the Act" and that "he is in need of a program more structured than that which is offered by the Youth Center." The trial court itself found, *inter alia*, that the "[d]efendant is criminally oriented and sophisticated in the ways of the world." However, particularly in light of the trial judge's subsequent "no alternative" language, none of these conclusions

amount to an explicit finding by him that Dancy would "not derive benefit from treatment under the Act."

Our experience demonstrates the wisdom of the Supreme Court's refusal to leave the "no benefit" finding to implication. In United States v. Van Buren, No. 72–1605 (D.C. Cir., Oct. 2, 1974), the trial judge relied on a host of negative findings in the defendant's § 5010(e) report to deny sentencing under the FYCA. Nevertheless, we remanded because of the judge's failure to make an explicit "no benefit" finding. On remand, the same trial judge—unable to make that finding—sentenced Van Buren to a Youth Act term.

**34.** 18 U.S.C. § 5010(e).

**35.** As discussed below, pages 14–21 *infra*, such inquiry has on occasion proven extremely valuable and revealing.

While no § 5010(e) examination was administered to the appellant in *Dorszynski*, Justice Marshall's separate opinion treats the problem of the weight to be given such examinations: "[T]he Act clearly intended that the ultimate sentencing decision remain with the trial judge. That decision should not pass by abdication to the correctional authorities who prepare the § 5010(e) study. Thus, where a trial judge secures a § 5010(e) report, he should adopt its reasons as his own only after assuring himself of the adequacy of the report and propriety of its recommendation." Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 3060, 41 L.Ed.2d 855 (1974).

lowed him "no alternative under the statute"—was evidently based on misinformation.

The Classification Committee which conducted Dancy's § 5010(e) study recommended that "Dancy should be sentenced as an adult with consideration for as short a term that is legally possible within the framework of this statute." This mention of a short sentence may well have been an effort by the Committee to strike a compromise between recommending a youth sentence and a long term adult sentence. The desire for such a compromise apparently stemmed from the opinion of the clinical psychologist who examined Dancy that the appellant was not totally devoid of rehabilitative potential but rather "could benefit from psychotherapy as well as vocational training and additional education." In his individual report, the clinical psychologist recommended sentencing as an adult "with the shortest term possible for his charge."

What was apparently unknown to the members of the Classification Committee—including the clinical psychologist—was that the trial judge had absolutely no discretion to give Dancy a short adult sentence. The mandatory minimum sentence for first degree murder, the central crime for which Dancy was convicted, is twenty years imprisonment with no possibility of parole.[36] Uninformed as to the sentencing alternatives available to the trial judge, the Classification Committee suggested a sentence that the trial court was powerless to impose.[37]

It is at least uncertain what the Classification Committee would have recommended had it known that an adult sentence for Dancy meant a definite term of imprisonment of at least twenty years. It would appear from the clinical psychologist's expressed concern that as likely as not he would have found such a mandatory minimum term inconsistent with the benefits he thought Dancy could derive from "psychotherapy, vocational training and additional education." At any rate it would be "callous"[38] to assume that the recommendation of the Classification Committee would necessarily have been the same had its members been accurately informed.

So far as the record before us is concerned, it would appear that the trial judge failed to exercise his discretion in sentencing Dancy and that he placed full reliance on a recommendation which itself may have been the product of misinformation. Given these factors, we must remand this case for resentencing.

## IV

■ The apparent reliance of the Classification Committee on the erroneous premise that Dancy was eligible for a short sentence may well not be the only defect in his § 5010(e) study. Since Dancy was sentenced, District Court proceedings on the conduct of § 5010(e) studies have been held in the cases of United States v. Norcome[39] and United States v. Tillman.[40] Information generated at these hearings raises the possibility that all studies—including Dancy's—that are conducted at the Lorton Youth Center suffer from highly serious procedural and substantive defects. Our responsibility to "careful[ly] scrutin[ize]   .   .

---

**36.** "Notwithstanding any other provision of law, a person convicted of first degree murder   .   .   .   shall be eligible for parole only after the expiration of twenty years from the date he commences to serve his sentence." 22 D.C.Code § 2404.

**37.** The Committee's *literal* recommendation of "as short a sentence that is legally possible within the framework of the statute" could of course be followed. However, the recommendation—particularly if based on Dancy's rehabilitative potential—clearly implies an assumption by the Classification Committee

that Dancy is statutorily eligible for a "short" sentence [i. e. one far less than twenty years].

**38.** *See* United States v. Tucker, 404 U.S. 443, 449 n. 8, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

**39.** 375 F.Supp. 270 (D.D.C.1974) (hearings conducted on Feb. 11–12, 1974 and March 21, 1974).

**40.** 374 F.Supp. 215 (D.D.C.1974) (hearings conducted on December 28, 1973 and January 2, 1974).

the judicial process"[41] and to insure that "the trial judge has considered the information available with some regard for its reliability"[42] compels us to take judicial notice of those hearings.[43] On remand we suggest that the District Court consider their relevance and the consequent possible need for detailed inquiry into the manner in which the § 5010(e) study was conducted in Dancy's case.

The *Norcome* hearing was held after two § 5010(e) studies conducted at Lorton had recommended that the defendant be given an adult sentence. During the course of the hearing, however, every one of the officials who had originally participated in making the adult recommendations *reversed* his original position that Youth Act treatment was not appropriate for Norcome.[44]. The trial judge ultimately gave Norcome a Youth Act sentence.[45]

In *Tillman*, the trial judge sentenced the defendant to an adult term on the basis of a § 5010(e) report recommendation. While the case was on appeal the record was remanded on Tillman's motion to allow the trial judge to recommit him for an updated § 5010(e) study. That report also recommended adult sentencing. However, on the basis of hearings held on the conduct of both studies, the trial judge reversed his original position and, contrary to the § 5010(e) study recommendations, imposed sentence under the FYCA.

These reversals of position make plain the crucial nature of the information generated at the *Norcome* and *Tillman* hearings. Uncovered at the hearings were a number of concrete and profoundly disturbing defects in the conduct of the Norcome and Tillman § 5010(e) studies. There is no reason to believe from the testimony at the hearings that these defects were anything other than *systemwide*—affecting Dancy's study and, indeed, every § 5010(e) study conducted at Lorton. The trial judges in *Norcome* and *Tillman* clearly perceived the problems as extending considerably beyond the particular cases before them. In *Norcome*, the trial court concluded that the "5010(e) diagnostic system [is a] farce" which provides courts with "inaccurate, erroneous and wholly misleading § 5010(e) reports and recommendations."[46] The *Tillman* court likewise concluded that the "procedural and substantive problems in the 5010(e) observation and study process at the Lorton

**41.** Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974).

**42.** Scott v. United States, 135 U.S.App.D.C. 377, 379, 419 F.2d 264, 266 (1969).

**43.** For our authority to notice the records of other litigation, *see* Gomez v. Wilson, 155 U.S.App.D.C. 242, 477 F.2d 411, 416 n. 28 (1973) (notice taken of citizens' affidavits filed in other litigation alleging police harassment); Zahn v. Transamerica Corp., 162 F.2d 36, 48 n. 20 (3rd Cir. 1947) (notice taken of pleadings in state case to establish whether it was derivative action); Allen v. State Board of Education of North Carolina, 55 F.R.D. 350, 353 (M.D.N.C.1972), aff'd 473 F.2d 906 (4th Cir. 1973) (notice taken of decisions and findings of fact in other desegregation litigation to determine need for relief in the instant case). Our reference here to the records in *Norcome* and *Tillman* is not meant to establish as factual the testimony presented therein. See Opinion of Judge Leventhal, concurring in the result, page 790 *infra*. Rather, it is for the purpose of noting that the testimony and judicial findings in those cases appear to be sufficiently relevant to the issues in the

present case to warrant inquiry on the remand we already require. For us to totally ignore *Norcome* and *Tillman* would be another act of that "blind court" that does not see what "all others can see and understand." United States v. Rumely, 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953).

**44.** 375 F.Supp. at 275.

**45.** Indeed, *Norcome* and *Tillman* are not the first occasions on which District Judges have expressed dissatisfaction with the quality of the § 5010(e) reports compiled by the Lorton Youth Center. In United States v. Alsbrook, 336 F.Supp. 973 (D.D.C.1971), Judge Gesell noted that "the Court is not receiving the type of thorough, knowledgeable report which the Court requires to exercise its responsibilities under the Act." *Id.* at 975.

**46.** 375 F.Supp. at 275. The court found that "[t]he record of the hearing reflects administrative practices in the diagnostic examination of youth offenders that border on extreme governmental dereliction of Congressionally-mandated responsibilities under the Act." *Id.* at 274.

Youth Center's diagnostic unit . . . have been impeding the preparation of 'the type of thorough, knowledgeable report which the Court requires to exercise its responsibilities under the [Youth Corrections Act].' " 374 F.Supp. at 217 (footnote omitted).

Among the defects that led the trial judges in *Norcome* and *Tillman* to reach such conclusions are the following:

A. *Youth Center personnel "demonstrated a lack of understanding of the goals [and substance]·of the Youth Corrections Act"*[47] *and of the scope of statutory sentencing alternatives.* For instance, the Classification and Parole Officer who evaluated Tillman testified that he did not know that the court must make a "no benefit" finding before an adult sentence can be imposed.[48]

Moreover, Tillman's original § 5010(e) report recommends a sentence for which he was not even legally eligible.[49] The "lack of understanding" by Youth Center personnel may stem from the fact that there is no organized means for informing them of judicial decisions interpreting the FYCA.[50]

B. *Several procedures followed in the preparation of § 5010(e) studies create the risk of shielding the trial judge from dissenting views of diagnostic personnel.* The individual reports of the clinical psychologists and Classification and Parole Officers who participate in § 5010(e) studies are typically prepared only *after* the Classification Committee meets and decides on its group recommendation.[51] This creates the temptation to harmonize one's individual report with the Commit-

**47.** United States v. Norcome, 375 F.Supp. 270, 277 (D.D.C.1974).

**48.** Tillman Hearing Transcript (hereinafter TT) 61; *see also* United States v. Norcome, 375 F.Supp. 270, 278 (D.D.C.1974).

**49.** The report recommended that Tillman be given an indeterminate sentence under 18 U.S.C. § 4208(a)(2). As a D.C.Code offender Tillman was statutorily ineligible to be sentenced under that provision. See Section 6 of Pub. L. 85–752, as amended by Pub. L. 86–70, § 17(b), June 25, 1959, 73 Stat. 144; Pub. L. 86–624, § 13(c), July 12, 1960, 74 Stat. 413.

**50.** The *Norcome* court found that Youth Center personnel demonstrated a "lack of training and expertise in the current status of the law" which contributed to "a maladministration of the Youth Act." 375 F.Supp. at 275. The Classification and Parole Officer on Norcome's Classification Committee testified as follows:

Q: As a rule, are you made aware of opinions by the Court of Appeals regarding Youth Act cases?
A: We do normally learn about them.
Q: How do you learn about them?
A: Normally through the papers.
Q: Are you given copies of the opinions themselves?
A: No.
Q: Are you given any instruction as to the legal criteria for conducting § 5010(e) studies?
A: No.          ·
Q: Do you have access to legal advice concerning the contents of a particular study?
A: No.

Q: Has anyone from the Office of the United States Attorney or the Corporation Counsel ever spoken to you about the legal criteria for § 5010(e) studies?
A: No.
Norcome Hearing Transcript (hereinafter NT) 59–60.

**51.** NT 162. *See* United States v. Norcome, 375 F.Supp. 270, 276 (D.D.C.1974). The testimony of the clinical psychologist who examined Tillman gives some idea of the procedure followed:
Q: When do you first inform the chairman [of the Classification Committee] of the information that you have in regard to a particular inmate?
A: We take turns. C&P officer might give his findings, and then I would give mine, and we would discuss it.
Q: Would the initial input from yourself to the chairman be at this meeting?
A: Yes, the first time.
Q: Where the determination of sentencing would be made?
A: That's right.
Q: You would not have forwarded on to him any reports?
A: No. As I indicated, the reports are not written, usually, until after the meeting.
Q: How about notes, would you have forwarded on to him any notes he could read ahead of time?
A: No, usually not.
Q: Did you follow the same pattern in the Tillman case as you would in any other cases?
A: Yes, we did.
TT 197–98.

tee's group evaluation. Moreover, no transcript is taken at Classification Committee meetings nor are notes preserved from those meetings.[52] Thus, it is extremely difficult to learn *post hoc* what views were exchanged at the meetings.

The trial judge's ability to gain a full understanding of the views of all diagnostic personnel may be further compromised—as it was in *Norcome*—by the failure of the Classification Commiteee to submit potentially significant background reports with its recommendations. Both a Progress Report and a vocational report on Norcome were prepared; neither was submitted to the trial court.[53]

Finally, the failure of each Classification Committee member to read each report that is issued over his name may also mask intra-Committee dissent. The clinical psychologist who examined Tillman testified that "it's the general practice of the Classification and Parole officer to write [the Committee evaluation and recommendation] and it might be done and sent out before I see it."[54]

C. *In* Norcome, *the § 5010(e) study contained false information on which the Classification Committee relied in making its adult sentencing recommendation.* The § 5010(e) study indicated that the defendant had another charge pending against him. Administrators of the D.C. Board of Parole and the D.C. Board of Corrections relied in their adult sentencing recommendation on this pending charge. In fact, the pending charge had been dismissed six weeks before the § 5010(e) report had been prepared.[55]

D. *Youth Center personnel "do not follow any uniform criteria"*[56] *for mak-*

*ing sentencing recommendations.* While one Youth Center staff member testified in the *Norcome* hearing that he did not weigh pending charges at all in making his recommendations, two others indicated that such charges are crucial to them in deciding on a recommendation.[57] During the *Tillman* hearings the Administrator of Lorton Youth Center "I" candidly acknowledged that § 5010(e) recommendations "are being made without criteria on an ad hoc basis."[58] The *Norcome* trial court explicitly found a "need for uniform standards and criteria to guide the corrections authorities in preparing the § 5010e reports".[59]

E. *In the absence of uniform criteria, Youth Center personnel often use vague and conclusory terms to justify recommending subjects for adult sentences.* Witnesses used terms such as "empty personality"[60] without being able to explain what they meant. The commonly used § 5010(e) report conclusion that the defendant has a "need for a more structured environment" was termed by the *Norcome* trial court "a cliche that has no place in a meaningful statement of findings on whether or not the Defendant will derive benefit from participation in Youth Act programs."[61]

F. *The* Norcome *court found that none of the psychological tests administered to § 5010(e) subjects "[have] been validated empirically with respect to measuring an individual's capability to benefit from Youth Act programs."*[62] No correlation has apparently been established between performance on any given diagnostic test and amenability to Youth Act treatment. The *Norcome* court found that the Classification Com-

---

52. NT 54–55, 234–35.

53. United States v. Norcome, 375 F.Supp. 270, 274 (D.D.C.1974), NT 171.

54. TT 193.

55. United States v. Norcome, 375 F.Supp. 270, 274, 282 (D.D.C.1974).

56. *Id.* at 281.

57. NT 407, 480–81.

58. TT 461–62.

59. 375 F.Supp. at 293.

60. *See, e. g.,* NT 41–51, 68–72. The trial court in *Norcome* classified such terms as "empty personality", "severity of the offense" and "bland personality" as cliches. 375 F.Supp. at 273.

61. *Id.* at 280.

62. *Id.* at 285; NT 622–24.

mittee relied "on test results despite the inability of the Committee members to justify either in their reports or testimony the employment of [such] results as a basis for disqualifying a youth offender from Youth Act treatment." [63]

V

■ In many cases, an FYCA sentence represents society's last chance to reclaim a young offender from a life of crime and degradation and to redirect his energies toward a productive and law-abiding participation in society. The Act commits us to deal with the criminal offenses of young people in something other than an exclusively punitive manner. Moreover, the diagnostic and treatment facilities provided for by the Act present an invaluable opportunity to learn why these youngsters have gone astray, whether and how society has failed them and what corrective measures can be taken to avoid such failure in the future. It follows that the extraordinary significance of the FYCA [64] necessitates that § 5010(e) studies—the informational basis upon which the court rests its critical sentencing decisions—be compiled with painstaking attention to accurate and full disclosure of all relevant considerations.[65]

The records in *Norcome* and *Tillman* illustrate the dangers presented by a process in which individuals who are not sufficiently aware of the FYCA provisions use nonvalidated non-uniform criteria, vague and conclusory language, and inadequately verified information to make ad hoc sentencing recommendations. Transmitted to the court with what may be significantly incomplete

sets of background reports, these recommendations may not represent the views of—or even have been read by—each person over whose name they appear. If we take the FYCA seriously—as we must—the sentencing process must be conducted in a manner far more in keeping with the critical nature of its potential consequences.

LEVENTHAL, Circuit Judge (concurring in the result):

While I agree that the case must be remanded for resentencing, I diverge from the approach of the majority in certain significant aspects.

I begin with the sentencing transcript. Before imposing sentence, the trial court made the following statements:

The recommendation of it [the evaluation report prepared according to 18 U.S.C. § 5010(e)] is that this Defendant be sentenced as an adult. The Youth Center recommended that the sentence would be of shorter [sic] duration as possible under the statute. The Board of Parole concurs with the recommendation of the Youth Center staff that the subject be sentenced under adult procedure, but does not recommend a short sentence. They find that the history of his activities is demonstrative of social disorganization and the reports indicate impulsive action and a sophisticated criminally oriented individual for whom the programs at the Youth Center are of dubious value and will not serve as there is an evident lack of amenability and motivation. (Sent. Tr. 2–3.)

The Court, finding that this Defendant is criminally oriented, sophisticated in

---

**63.** 375 F.Supp. at 294.

**64.** In Haziel v. United States, 131 U.S.App. D.C. 298, 404 F.2d 1275 (1968), this court noted the importance of "the divide between the Juvenile Court with its promise of non-punitive rehabilitation and the harsher world of the District Court." *Id.* at 1278. As seen here, the "divide" between FYCA and adult sentencing may be just as significant.

**65.** It may be said that our emphasis on the need for close examination of § 5010(e) stud-

ies will lead trial judges to avoid the burden of such scrutiny by simply refusing to order the preparation of any more studies. We reject the notion that the trial bench will so discharge its grave responsibilities. What is called for is not the abandonment of § 5010(e) reports but rather the elimination of their defects and the development of a § 5010(e) process of the highest quality. Careful scrutiny by trial judges is critical to the achievement of these goals.

the ways of the criminal world, and that he has for a long period of time engaged in criminal activities, that he has on prior occasions had the benefit of probation, that he has not responded to the attempts that have been made in the past; the Court further finds that the Youth Center, itself, has evaluated him and finds that he is not an appropriate person for the benefits of the Act and feels that he should not be sentenced under the terms of the Act; and the Court further finds that the Probation Office also finds that the Defendant is in need of a program more structured than that which is offered by the Youth Center and that the Board of Parole, likewise, concurs in these findings and recommends sentence as an adult. This Court is of the opinion that in view of the fact that the Youth Center, itself, has indicated that sentencing him as a youth would not be the proper procedure and that they would not be able to supply the needs that he has; and although the Court recognizes that mere incarceration may not be rehabilitative, nevertheless, the Court has no alternative under the statute. (Sent. Tr. 4–5.)

I think it most unlikely that the last sentence meant that the court deemed itself legally required to make a finding that the defendant would not benefit from Youth Corrections Act treatment. Indeed, I think it most probable that the trial judge meant that in view of the findings of the Lorton Youth Center the case was overwhelmingly clear, that he had no *realistic* alternative. This reflected not an abdication of discretion, but an exercise of judicial discretion—to make a determination on the record.

We are dealing with a transcript of oral remarks, not a written opinion. For example, at one point the trial judge referred to the Youth Center's recommendation "that the sentence would be of shorter duration as possible" while its exact words were "The recommendation that would best fit his needs is con-

sidered to be sentencing as an adult, with the shortest term possible for his charge." But I cannot say that there is no doubt whatever as to the premise or intention of the trial judge. The doubt is slight, even minimal. Ordinarily, in such a case an appellate court may remand for clarification of findings of a District Court. In this area of Youth Corrections Act sentencing, however, the Supreme Court has laid it down in Dorszynski v. United States [1] that "an express finding of no benefit must be made on the record".[2] In *Dorszynski*, the Supreme Court reversed a ruling of the appellate court that the district court had made the finding "by implication," and held that a remand for resentencing is required when it is "unclear" whether the District Court's wording "meant the court believed petitioner to be legally ineligible for treatment under the Act . . . or whether, realizing he was eligible, nevertheless deliberately opted to sentence him as an adult." Chief Justice Burger explained: "An explicit finding that petitioner would not have benefited from treatment under the Act would have removed all doubt concerning whether the enlarged discretion Congress provided to sentencing courts was indeed exercised." [3]

While the problem before us is not precisely the same as that created by the wording of the trial judge in *Dorszynski*, *Dorszynski's* stress on the importance of removing "all doubt" teaches me that even a scintilla of doubt occasions a remand for resentencing, not as time-consuming as a remand for retrial, yet looming large in significance.

I disagree with so much of the majority's analysis as rests on the premise that the trial judge was the victim of misinformation. He was well aware that he had no authority to impose a sentence less than the one that he imposed, twenty years to life imprisonment. He was aware too of the legally futile quality of the classification board's expression that

1. 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

2. *Id.* at 3044.
3. *Id.* at 3053.

the defendant be given the least adult sentence possible. But he was aware of the fact that its conclusion was not made dependent on a short sentence. And if he wanted to test whether the classification board ..would have adhered to its conclusion even though it had to recognize explicitly that no adult sentence of less than twenty years was possible, he had the means to accomplish this.

*Dorszynski* teaches that, however short-sighted a district judge may be in the view of the appellate court, the court has neither the power to revise the sentence, nor the authority to insist that the district judge provide a statement of reasons. While *Dorszynski* does permit some appellate consideration, as pointed out in United States v. Allen, 166 U.S. App.D.C. ——, ——, 510 F.2d 652, 653 (1974), I think the fair implication of the Supreme Court's opinion is to inhibit appellate review of district court judgments for the purpose of discerning shortcomings in underlying reasoning—and that is essentially what the majority opinion reflects.

Part IV of the court's opinion contains material of much interest. I do not agree, however, that the doctrine of judicial notice can be stretched to pick up testimony in other cases, on the working of the Youth Center in its reports, as establishing factual material available to the appellate court to undercut an adult sentence for the youthful offender in this case. An appellate court may, on occasion, "in the interest of justice, and to provide sound disposition of precedential questions of law," refer to factual items lodged by the parties, though not part of the record—"where there is no significant factual issue." United States v. Kearney, 136 U.S.App.D.C. 328, 331, 420 F.2d 170, 173 (1969). The court sees fit to take judicial notice of the testimony presented in United States v. Norcome, 375 F.Supp. 270 (D.D.C.1974), and United States v. Tillman, 374 F.Supp. 215 (D.D.C.1974). I think this is impermissible where the material was not lodged, submitted or suggested by any party, and is indeed used to introduce a claim not made by a party; where we gave no opportunity to the Government to comment, contradict or qualify; and where we certainly have no basis for saying there is no significant factual issue. If an administrative agency were to use the concept of judicial notice in such a manner, this court would indignantly condemn the action as arbitrary.[4] The French proverb puts it that in the realm of the blind, a one-eyed man can be king. But for an American judge true vision and the full perspective of the scene must abide the adversary process.

While judges may, using due procedure, attend to concerns sparked or identified by the testimony in *Norcome* and *Tillman*, our appellate court should, in my view, confine itself to ruling that, in complying with our mandate of resentencing, the District Judge is free to make the kind of inquiry that other district judges have found useful—without any intimation that it is an inquiry that may be required as a matter of law.

---

4. *See* Public Service Commission of New York v. FPC (Texas Gulf Coast Area Natural Gas Rate Cases), 159 U.S.App.D.C. 172, 198–200, 487 F.2d 1043, 1069–1071 (1973), vacated and remanded, 417 U.S. 964, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1974).