**UNITED STATES of America**

v.

**James A. ALSBROOK.**

**Crim. No. 1065–71.**

United States District Court,
District of Columbia.

Dec. 1, 1971.

Supplemental Memorandum Dec. 23, 1971.

John Z. Noyes, Washington, D. C., for defendant.

Daniel A. Rezneck, of Arnold & Porter, Washington, D. C., amicus curiae appointed by the Court.

Robert A. Shuker, Richard A. Hibey, Asst. U. S. Attys., John A. Earnest, Shane Stark, Asst. Corp. Counsels, John Perazich, Paul Chernoff, Washington, D. C. Public Defender Service.

FINDINGS OF FACT AND [1] CONCLUSIONS OF LAW ON ANCILLARY HEARING

GESELL, District Judge.

The Lorton Youth Center and the D. C. Board of Parole, while finding defendant Alsbrook amenable to rehabilitative treatment under the Federal Youth Corrections Act,[2] recommended that he be sentenced as an adult on the ground that "meaningful treatment cannot be provided due to overcrowding and inadequate facilities." Because of this development and other recent indications that there has been a local breakdown in the administration of the Youth Corrections Act, this Court noticed an ancillary fact-finding hearing in aid of sentencing which was held on November 19.[3] For reasons set out below, the Court has concluded that immediate steps must be taken both by correction authorities and the Court so that the Court's sentencing functions can be carried out in this jurisdiction in a manner consistent with the Act and implementing decisions of the United States Court of Appeals for the District of Columbia.

The Youth Corrections Act was originally enacted in 1950. Later, in 1952, Congress provided that D. C. Code youth offenders would also be eligible for Youth Act commitment. The Act was amended accordingly and funds were subsequently provided for the present Youth facility situated at Lorton, Virginia.

The Act contemplates that offenders convicted prior to reaching age 22 may be considered for commitment under indeterminate sentences to an appropriate

1. Editors Note: At an Executive Session held November 30, the full Court took cognizance of the findings of fact and conclusions of law now filed by Judge Gesell following the ancillary hearing in the *Alsbrook* matter and approved the emergency recommendation therein contained. The Court also endorses the need for further hearing scheduled for the purpose of putting an interim plan for added facilities promptly into effect.

Sirica, C. J.

2. 18 U.S.C. § 5005 et seq.

3. Chief Judge John J. Sirica sat with the Court as an observer at the hearing. The following appeared as witnesses: Robert C. Whitaker, Superintendent of the Youth Center at Lorton; Allen M. Schuman, Superintendent of Youth Services of the D.C. Department of Corrections; Kenneth L. Hardy, Director of the D.C. Department of Corrections; and Richard J. Heaney, Deputy Director of the Federal Bureau of Prisons.

youth facility, there to receive treatment and rehabilitation. Typically, educational, vocational and therapeutic assistance are provided at such a Youth Center. Offenders committed under the Act are released by the correction authorities when considered ready to re-enter civilian life, regardless of the length of indeterminate sentence imposed by the Court. Often release is to a half-way house or other transitional community center for a short period of one or two months in order that adjustment to civilian life may occur under a degree of supervision.

The Act represents a humane and deliberate effort to assist young offenders by coupling an adequate degree of punishment with supervised treatment in the hope of salvaging many among the increasing number of young adult offenders involved in serious criminal conduct. Similar institutions have been created by some states and many of these programs have, generally speaking, been quite successful. The basic theory of the Act is rehabilitative, a consideration to be given priority unless the sentencing judge is convinced a youth is incorrigible and unable to derive help from the program as provided.[4]

Two types of commitments are available under the Act: a 5010(b) commitment which involves an indeterminate sentence up to six years; and a 5010(c) commitment which involves an indeterminate sentence for a greater number of years as may be specified by the sentencing judge. It is also provided in 5010(e) that an offender may be committed preliminarily for a period of approximately 60 days for the purpose of obtaining a full background report indicating the amenability of the offender to the Youth program in view of his needs and the type and degree of supervision required. Following such study, the Court may impose sentence on the basis of the study report and other information available.

Here in the District of Columbia, many young felony offenders eligible under the Youth Corrections Act have been committed by the United States District Court to the Lorton Youth Center. Judges have made frequent use of the 5010(e) type of preliminary study in order to aid in imposing the ultimate sentence. For reasons that will appear, the Court is not receiving the type of thorough, knowledgeable report which the Court requires to exercise its responsibilities under the Act. Yet in recent months the necessity of an adequate 5010(e) study preliminary to final commitment has become more apparent in view of the decision of the United States Court of Appeals in *Waters* which requires the sentencing judge to enunciate affirmatively on the record his reasons for believing rehabilitation is not feasible under the Act in any instance where an otherwise eligible youthful offender receives an adult commitment. This usually involves a specified minimum and maximum term at an adult prison.

The Youth Center at Lorton, constructed in 1966, was designed for a capacity of 300 inmates. Single dormitory rooms are provided. The complex has minimal vocational, educational and therapeutic accommodations geared to a 300-inmate capacity as designed. A special unit was constructed at the Center to accommodate individuals committed preliminarily for purposes of a 5010(e) study.

Because of the rising incidence of crime among young adults, more effective law enforcement, and other factors, this Lorton Youth facility is now completely inadequate to handle commitments by the United States District Court under the Act. This would still be the case even if the heavy commitments to the facility from the Superior Court of felony and misdemeanor offenders were totally ignored.

The Center now has a census of approximately 385 inmates and has on a

4. United States v. Waters, 141 U.S.App. D.C. 289, 437 F.2d 722 (1970). H.R. Rep. No. 2979, 81st Cong., 2d Sess. (1950). S. Rep. No. 1180, 81st Cong., 1st Sess. (1949).

number of recent occasions had over 400. Correction authorities are unable to handle more than 340 or 350 inmates at the Center and still provide that minimum degree of treatment and rehabilitative service required by the Act.

█ The special unit at the Center designed for 5010(e) studies has been used to house offenders finally committed under the Act and as a result there are 85 in this unit originally built for 40. The authorities are, against their better judgment, utilizing the D. C. Jail for study purposes in most instances where offenders are initially committed for study under 5010(e). At present, there are 133 defendants undergoing 5010(e) studies at the Jail. Correction authorities generally acknowledged that when such studies are conducted at the Jail they are inadequate, inappropriate and undesirable,[5] and the Court finds that the Jail is not an "appropriate classification center or agency" under 5010(e). This situation is caused solely by the seriously overcrowded conditions at the Lorton Youth Center.

The Mayor-Commissioner advised the Court at the hearing that the Center will refuse to accept more than 350, a number well below current census. This is a frank recognition that the facility cannot now or in the future meet the requirements of the Courts in this community under the Act.[6]

Since September, 1971, 43 defendants believed to be amenable to rehabilitation have, like Alsbrook, been recommended for adult incarceration due entirely to overcrowding and indeed there have been 64 offenders in this category since the first of January. When the authorities limit the level at the Center to 350, a substantially greater number will have to be regularly recommended for adult commitment. There is no legal authority for diverting otherwise eligible youths to adult institutions due solely to lack of space.

These extremely critical overcrowded conditions must be viewed in the light of expected immediate future developments. In the next twelve months the Center expects to receive approximately 1200 commitments, assuming the present procedure which results in committing all parole violators to adult institutions is continued.[7] Thus the immediate re-

---

5. For example, the Superintendent of the Youth Center at Lorton stated:

[T]o effectively make a recommendation to the Court, on our observation on this man, it is unrealistic to think if we house a man in a jail cell, and we send our C. and P., our diagnostic team up there to call him out of the jail cell to talk to him, and he goes back in the jail cell, who is observing the man, other than the three officers who are in the cell block? There really is no observation. The observation takes place when the man goes up and gives the social history, the background history, school, his work, and so on, and so forth. But it is unrealistic to think we can provide an intelligent observation of the man. (Tr. p. 15).

. . . I see it as not really being able to effectively observe the man, his behavior, his attitude, what his remorse is about the crime he committed, and so forth.

The ideal—when the Youth Center was constructed some years ago, the man was at the Youth Center, he went about attending classes, being seen by the psychologist on a kind of regular basis, being seen by the classification and social worker, being introduced to vocational and academic programs at the Youth Center, seeing him among the population, as to how he is going to react to institutional life, whether that kind of setting is best for the man. We don't have that kind of situation right now. (Tr. p. 16).

6. Mr. Whitaker stated the conclusion bluntly:

Without the tools and without the facilities, we can't do a job. It is unrealistic to think that we have a magic wand, that we can cope with those kinds of population figures and do an effective job in rehabilitating a man. (Tr. p. 22).

7. "It is anticipated that there will be approximately 900 commitments under 5010(e) and 240 direct commitments under 5010(b) and 5010(c) in the next twelve months. Parole violators presently number approximately 16 per month

quirements which the Courts are expected to place on the Center exceed by well over 100 percent the capacity which the Center when stretched to its outermost limits can or will accept. This conclusion does not reflect any change in the present rate of turnover which is all too rapid.

The pressures from overcrowding result in a complete frustration of the Youth Corrections Act program. Not only are the correction authorities and the sentencing judges required to reach commitment determinations upon inadequate 5010(e) studies; the rehabilitation program of the Center itself is stultified. Vocational, educational and therapeutic facilities are increasingly less effective to handle the numbers presented within the time periods available. The volume of new offenders is such that the Center has been forced to release inmates at all too early a date. Often individuals are sent to half-way houses or other community facilities before they are ready. Such premature release defeats treatment objectives and encourages recidivism. The report submitted by the Mayor-Commissioner states that the Department of Corrections considers the number of persons in the half-way houses or community treatment centers as far too many and that "roughly half that number ought not to be in that center [i. e., the community treatment center] but ought to be in the Youth Center."

About 80 percent of offenders committed to the Center have a drug problem in some degree and yet neither the Center nor the community centers have personnel or facilities that are devoted to the prevention of drug use. Indeed there was evidence at the hearing that contin-

ued drug usage by an offender does not even prevent release into the community from half-way houses.[8]

While there have undoubtedly been some advances made at the Youth Center in terms of shortening the program of treatment and rehabilitation, the significant reduction in time spent, particularly by sophisticated defendants committed under the Youth Corrections Act, illustrates the pressures of overcrowding and the consequent lack of adequate rehabilitative care. Robbery, rape and homicide commitments in 1967 averaged 32 months from sentence to parole. By 1970, the figure was down to approximately 11 months and in 1971, at the most eight to ten months. Analysis of information submitted by the U.S. Attorney based on Police Department data received in turn from the correction authorities shows numerous cases of serious offenders committed under the Youth Act for armed robbery, rape, murder or aggravated assaults who spent periods in the Youth Center substantially less than six months, having been sentenced to periods of six, eight, ten or fifteen years, and in some cases such defendants were in the Youth Center only for a period of two or three months.

The Center's operations also suffer from the fact that there has been undue intermingling of highly sophisticated, hardened defendants with defendants who have committed non-violent offenses and have not an experience of frequent incarceration in juvenile or other youth facilities.[9] In spite of the overcrowding the Center has rarely rejected an offender because of his criminal activities. Nor has there been any effort to be highly selective when recommending youthful

---

or 192 in the next twelve months. The anticipated increase totalling 1,256 is of course in addition to our present youth population of 609. This does not include approximately 150 16 and 17 year olds expected in the next twelve months." Letter from Kenneth L. Hardy to Judge Gesell, November 18, 1971, p. 5.

8. Mr. Schuman estimated that 20 percent presently in half-way houses are drug users. Tr. p. 67.

9. " . . . Insofar as practical, . . . youth offenders shall be segregated from other offenders, and such classes of committed youth offenders shall be segregated according to their needs for treatment." 18 U.S.C. § 5011.

offenders for incarceration. While some co-mingling of the sophisticated and unsophisticated defendant may always occur, the present program is made far more difficult and less effective as the numbers in both categories increase and inmates are crowded more and more on top of each other under conditions which minimize the possibility of individualized treatment or control. This situation presently totally defeats efforts of sentencing judges to isolate for special handling defendants whose age or background indicates special rehabilitative needs.

In contrast, the Federal Youth Corrections Act system has established several facilities and can differentiate among types of offenders by age and offense. This desirable flexibility is not available in the District of Columbia. While other Youth Centers operated throughout the country under the Director of the Federal Bureau of Prisons are full, there is much less overcrowding, the number of violent and sophisticated offenders committed is minimal and yet the period of incarceration is substantially longer.[10] It is also significant that these other institutions, unlike the Lorton Youth Center, recognize a clear distinction between 5010(b) and 5010(c) commitments, holding 5010(c) committees a longer period of time.[11] At the Lorton Youth Center there is no consideration whatsoever given by the authorities to the fact that individuals committed under 5010(c) sentences have been judicially determined to require longer treatment. Moreover, in the federal institutions, no individual is released to the community without the approval of the Board of Parole,[12] while here the Center does not always consult the Board of Parole and the Court's experience indicates it may act contrary to the Board's wishes in releasing to halfway houses after brief incarceration.

The local correction authorities believe that in order to meet the needs of the Youth Corrections Act in this community it will be necessary to construct one and possibly two additional facilities, each with a projected inmate census of 500. Requests to the Congress for funds to establish the first additional facility have been rejected. No construction of additional facilities is authorized or in progress. The Director of the Federal Bureau of Prisons has no available facilities to take any of the load from the District of Columbia.

■ All persons sentenced under the Act are committed to the custody of the Attorney General and it is the ultimate responsibility of the Federal and City authorities to furnish the necessary facilities. This responsibility falls jointly upon the Director of the Federal Bureau of Prisons and the Mayor-Commissioner of this City.[13]

---

10. Tr. pp. 161, 154 and 156 (Testimony of Richard J. Heaney, Deputy Director of the Federal Bureau of Prisons).

11. According to Mr. Heaney's testimony, in 1970, the average commitment under 5010(b) was 21.5 months whereas the average commitment under 5010(c) was 33.6 months. Tr. p. 156.

12. Tr. p. 173.

13. The legislative history of what is now 18 U.S.C. § 5025 is sparse. Nevertheless, it indicates that Congress's primary purpose was to transfer supervision of youths convicted of violations in the District from the U.S. Bureau of Prisons and the Youth Corrections Division of the U.S. Board of Parole to the District of Columbia Mayor-Commissioner. There is no indication from the legislative history of this statute that Congress wanted to relieve authorities of the Department of Justice and the Bureau of Prisons from their statutory obligations in Sections 5011 and 5012 to provide treatment in proper and adequate treatment facilities, H.Rep.No. 387, 90th Cong., 1st Sess.; S.Rep.No. 912, 90th Cong., 1st Sess.; Report of the President's Commission on Crime in the District of Columbia, pp. 452, 471 (1966); Hearings before Subcommittee No. 4 of the House Committee on the District of Columbia on Omnibus Anticrime Bills, 90th Cong., 1st Sess., p. 63; Hearings before the Subcommittee on the Judiciary of the Senate Committee on the District of Columbia, 90th Cong., 1st Sess., pp. 75, 133–138, 250.

■ The proper administration of justice, the requirements of the statute and the interests of this community demand that adequate facilities promptly be made available. The shortage of proper accommodations cannot be tolerated any longer. There is need of both an interim and a long-term solution.

The Court accordingly directs the Attorney General, the Director of the Federal Bureau of Prisons and the Mayor-Commissioner jointly to submit in writing within two weeks an interim plan for alleviating the present congestion consistent with the requirements of the Act. The interim plan should specify what steps will be taken and the date by which each phase of the plan will be accomplished. The plan should at the very least accomplish the following:

(a) Create additional temporary facilities for at least 300 male inmates by April 1, 1972.

(b) Provide facilities also sufficient to enable authorities to conduct all 5010(e) studies at a suitable location or locations other than the D.C. Jail by January 1, 1972.

These new facilities may be minimum security facilities if sufficient to accommodate non-violent offenders, including the bulk of offenders in the age group 16–18.

In directing that an interim plan for creation of additional facilities be submitted, the Court has carefully considered elaborate materials presented for the record on behalf of the Mayor-Commissioner. It appears that a detailed analysis of the available capacity of correctional facilities and institutions has already been made by a special task force. On the basis of this analysis, after projecting expected caseloads, the decision has been made administratively that the present facilities at Occoquan could be turned into an additional Youth

facility by transferring individuals in the alcoholic rehabilitation program. This and related adjustments would provide a Youth Center facility capable of increasing the present total capacity to 625. This would be sufficient to handle the projected 1972 Youth Center population, although, of course, would not take care of the long-term need. Whether this plan or some variable of this plan is chosen is, however, entirely a matter for consideration of the appropriate authorities.

Since any interim solution which will be proposed will not fully alleviate the situation, it appears necessary that this Court take some emergency steps consistent with the realities of the problem which will improve administration under the Act. The following has been recommended for consideration of the full Court.[14] Where the individual United States District Court Judge concludes that a defendant may be amenable for final commitment under the Youth Corrections Act, the following should occur:

(1) No defendant shall be so committed under the Youth Corrections Act without a 5010(e) study.

(2) In the event the study indicates that the correction authorities consider the defendant amenable to final commitment under the Youth Corrections Act, the Court shall require as part of the 5010(e) report a precise statement by the correction authorities of the plan of treatment and the approximate period of time it is contemplated the defendant will be in custody before release to a half-way house, including goals that will be set for him prior to release.

(3) No defendant shall be committed under the Youth Corrections Act unless the Attorney General certifies in advance as to each defendant that a facility is available to provide the

---

14. The Superior Court faces comparable problems in dealing with both felony and misdemeanor cases and obviously that Court can assist in the present difficult circumstances if comparable emergency steps are taken to prevent gross overcrowding and encourage more knowledgeable commitments where the Act is employed.

type of program and adequate period of treatment contemplated in the particular 5010(e) report.

(4) Under appropriate circumstances, the Court shall commit all offenders under U.S. Code offenses for 5010 (e) studies and ultimate incarceration at other Youth Centers around the country.

The Court recognizes that if these emergency steps are taken by the Court as a whole and an interim plan is put into effect promptly to alleviate the immediate overcrowding crisis, that further action must still be taken to provide adequate facilities. The Court urges that energetic and immediate action be taken by the Attorney General and the Federal Bureau of Prisons and the Mayor-Commissioner to obtain necessary construction and supportive funds from the Congress so that facilities and personnel can be provided on an expedited basis through emergency appropriations within the shortest possible period of time and without awaiting the implementation of the interim steps to be covered by the plan.

■ A full discussion of the Court's authority to place an interim plan into effect, to announce emergency procedures, and to take whatever further steps may be necessary to make the Youth Corrections Act viable is not required at this stage. Suffice it to note that as an Article III Court under the Constitution this Court is vested with "the judicial power of the United States." This is a grant of an inherent authority to direct action which is found essential to the continued effective functioning of the Federal Courts. The Court's supervisory powers must be exercised to this end. Unless adequate facilities are made available, the Court's role in sentencing becomes merely advisory and it loses the "judicial power" to enforce its orders of commitment under the Act. Moreover, the mandatory requirements of Sections 5011 to 5014, inclusive, and 5025(c) which direct the Mayor-Commissioner and the Director of the Federal Bureau of Prisons to provide treatment facilities must be enforced in accordance with the express directions of the Congress. Given comparable constitutional and statutory authority, Courts have in the past ordered executive action without regard to the availability of earmarked funds.[15]

■ This is such a case—a case where it has become abundantly clear that immediate action by the Court is required to assure the fair and proper administration of justice under a statute enacted by the Congress.

There are many offenders below the age of 22 who come before this Court who can be and have been rehabilitated through the Youth Corrections Act program. Congress has wisely put such a program into effect and experience has emphasized and re-emphasized the validity of this approach to many young offenders in a community such as Washington, D. C. The breakdown that has occurred is a tragedy for this city. Not only are defendants denied the treatment and training Congress requires, but premature release is placing citizens unnecessarily at hazard and it cannot be disputed that a correctional system that

---

15. Increasingly in the area of jail and prison reform, courts are directing changes that perforce will entail additional expenditures. In the Matter of Savoy and Toney Hazel (Docket Nos. 70–4808, 70–4714, Oct. 13, 1970, opinion of Greene, C. J., D.C. Superior Court; Landman v. Royster, 333 F.Supp. 621 (E.D.Va., 1971); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), affirmed, 442 F.2d 304 (8th Cir. 1971); Jones v. Wittenberg, 323 F.Supp. 93 and 330 F.Supp. 707 (N.D. Ohio 1971); McCray v. Maryland, Misc.Pet. 4363–4430 (Cir.Ct. Montgomery Cty., Md., Nov. 11, 1971); State ex rel. Ray v. South, 176 Ohio St. 241, 198 N.E. 2d 919 (1964). Also in the area of school desegregation, courts have required certain changes which necessitated additional expenditures. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 and Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), modified, Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

ignores the clear intendment of the Court's sentences leads the public to question the very integrity of our judicial process. This Court cannot stand idly by and permit these conditions, whatever the cause, to continue. The Court is entitled to have facilities provided sufficient to make the Act effective and the Court must insist that its sentencing orders are implemented in the interests of the fair and proper administration of justice.

A hearing to consider placing an appropriate interim plan into effect is hereby set for December 23, 1971, at 9:30 a. m.

## SUPPLEMENTAL MEMORANDUM
December 23, 1971

A plan for alleviating the serious overcrowding at the Lorton Youth Center and for providing appropriate facilities for observation and study of youth offenders committed preliminarily under the provisions of 5010(e) of the Youth Corrections Act has been submitted by the Mayor-Commissioner and the Director of the Federal Bureau of Prisons. This action was taken at the Court's direction pursuant to findings of fact and conclusions of law filed December 1. A hearing on the plan has now been completed.

As of December 6, 1971, there were 394 defendants at the Youth Center and 130 defendants awaiting or undergoing 5010(e) studies at the D. C. Jail. By direction of the Mayor-Commissioner, no further commitments can be made to the Youth Center at Lorton until the number there committed is reduced to 350 men and thereafter the facility will be certified only for 350 young men.

Without attempting to specify all details of the plan, the following will summarize what has been proposed:

(1) Effective January 1, 1972, provision will be made for housing up to 150 male inmates at locations other than the Jail for the purpose of undergoing observation and study under 5010(e). Seventy-five inmates will be housed at a minimum security facility adjacent to the former workhouse and 75 will be committed to the special facility that was originally created for this purpose at the Youth Center itself.

(2) Between January 1, 1972, and April 1, 1972, the Federal Bureau of Prisons will accept responsibility for 75 men committed under the Youth Corrections Act to be made up of all offenders committed for U. S. Code offenses and additional local offenders if the 75 commitments to be accepted is not taken up entirely with U. S. Code offenders.

(3) Effective April 1, 1972, a new facility to accommodate 300 male inmates will be established by transforming and renovating the former Women's Reformatory. Initially this will be on a minimum-security basis and by July 1 on an added-security basis. During the minimum-security period this facility will be used for misdemeanants and inmates sentenced for non-violent felonies.

The Court has carefully reviewed this plan which the authorities are prepared to put immediately into effect. The plan is feasible, it is required as the bare minimum necessary for the continued implementation of the Youth Corrections Act in this jurisdiction, and it will promote the fair and proper administration of justice. Accordingly, the plan as generally outlined above is approved. Time is of the essence. The Court will retain jurisdiction so that it may, if necessary, act to assure prompt and adequate implementation of the plan.

At a hearing held on the plan this day, certain procedures appropriate to assure the success of the plan were considered. It is not possible to anticipate all of the administrative matters that may require attention. Of immediate importance, however, is the need to establish a procedure for dealing with those youth offenders committed during the first three months of 1972 since it is obvious that facilities will not be sufficient to accommodate all men committed for study or for indeterminate terms under 5010(b) or 5010(c). There will as a

consequence be conflicting demands upon the available facilities not only as among the Judges of this Court but by reason of the substantial referrals under the Youth Corrections Act made in the regular course by the Superior Court. In all instances where a Judge of either Court believes that immediate commitment is required, the individual will be held at the D. C. Jail pending available space and, where feasible, isolated from adult offenders. Young offenders will then be drawn by the correction authorities from the Jail into the available youth facilities, having regard for the length of jail time served, as space opens up. This will also enable the correctional authorities in their discretion to determine which men held at the Jail will be sent to youth facilities operated by the Federal Bureau of Prisons and which men will be sent to the Youth Center. Moreover, the Judges of both Courts will be accommodated without preference.

The Court suggests that correction authorities give special attention to placement of youth offenders in the 16–18 age bracket who are committed under the Act. In some instances separation of these men from more hardened older youths may be particularly desirable. In working out arrangements between the Bureau of Prisons and the Mayor-Commissioner for the selection of men to be sent to other Federal youth facilities, it may well be that some youth offenders in this age bracket should receive special consideration to permit study and incarceration at Federal facilities such as Ashland, Kentucky.

In submitting the plan, correction authorities have called attention to the added burden created by requiring 5010(e) studies in all cases prior to a final Youth Act commitment and note that the statute does not require such studies in every case. At the last sentencing institute of this Court, use of these studies was recommended by correctional authorities. Both this Court and the Superior Court have, moreover, adopted a policy in the present emergency of requiring such studies and it does not appear appropriate to reconsider this position, at least during the immediate interim period. Whatever the availability of facilities, sentencing under the Youth Act is necessarily a selective process. Moreover, the decision of the United States Court of Appeals in *Waters* establishes a special rule in this Circuit that requires a statement by the sentencing judge of his reasons for imposing an adult sentence whenever a youth offender receives such a sentence and of course such a statement must have factual support. No experienced judge feels he will not benefit from the advice from specialists who will be called on to accomplish the rehabilitation desired. The 5010(e) report enables the sentencing judge to determine whether or not the correction authorities and the Parole Board feel that the necessary treatment and rehabilitative services can be provided. Such a report contains important psychological and other data not customarily found in presentence reports. Perhaps during the interim period greater coordination can be achieved between the Probation Office and the correction authorities to speed the preparation of these reports and lessen study time. The Court urges this be done, with a view to re-examining the present policies of the Court shortly after April 1. The Probation Office of this Court will be happy to participate.

For some time the shortages of facilities and manpower in the correction system in the District of Columbia has kept this city balancing precariously on the brink of prison disruptions that might rival the tragic consequences of incidents that have unfortunately occurred in some other parts of the country. An impending crisis in the youth correction field has hopefully been avoided by the interim solutions proposed in response to the Court's inquiry. It is very heartening to note the close coordination in this matter that has been achieved between this Court and the Superior Court. The conscientious manner in which the needs of the judiciary have been accommodated by the plan is heartening. The Execu-

tive Branch has commendably shown a sense of urgency and acted in good faith.

Obviously, however, much more must be done. Constructive, long-term solutions are needed as all elements of the community are now aware, and efforts to this end should go forward promptly to avoid further patchwork approaches to what is an obvious necessity, namely to construct and to man adequate correction facilities for this city. The Constitution, the Youth Corrections Act, and the conscience of a civilized society require that youth offenders receive firm but effective opportunity for treatment and realistic rehabilitation.