UNITED STATES of America

v.

Tyrone C. HOPKINS, Appellant.

No. 75–1041.

United States Court of Appeals,
District of Columbia Circuit.

Submitted Without Argument Oct.
20, 1975.

Decided Jan. 26, 1976.

As Modified March 1, 1976.

Julian Tepper, Washington, D. C. (appointed by this Court), was on the brief for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry and Richard A. Graham, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, HASTIE,[*] Senior Circuit Judge for the Third Circuit, and ROBB, Circuit Judge.

BAZELON, Chief Judge:

On November 10, 1972 the district court accepted appellant's plea of guilty to a charge of manslaughter,[1] and entered an order committing him to Lorton Youth Center for observation and study under the provisions of the Federal Youth Corrections Act (FYCA).[2] Appellant was then nineteen years old.

The Classification Committee[3] recommended FYCA sentencing,[4] having determined that appellant would be "amenable to a structured program such as that offered at the Youth Center." In the cover letter sent, along with the Classification Committee's evaluation and recommendation, to the D.C. Board of Parole, the superintendent of the Youth Center indicated that he would concur with the FYCA sentence recommendation only if a federal facility could be designated.[5] The Parole Board rejected the superintendent's sugges-

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. 22 D.C.Code § 2405.

2. The Federal Youth Corrections Act of 1950 appears in 18 U.S.C. § 5005 et seq. Under § 5010(e) if the court desires additional information as to whether a youth offender will derive benefit from FYCA treatment, "it may order that he be committed to the custody of the Attorney General for observation and study at an appropriate classification center or agency."

3. The Classification Committee at the Lorton Youth Center is made up of three individuals—a classification and parole officer, a clinical psychologist, and the administrator of the Diagnostic Unit, who chairs the Committee. Their evaluation, which includes a synopsis of the youth's "developmental history and social background," his "education," "employment history," a "medical and psychological" profile, general staff "observations and impressions," and the Committee's ultimate recommendation, is the most complete of the § 5010(e) documents.

4. There are four alternative sentences available to the trial court under the FYCA. The first allows the judge to suspend imposition or exe-

cution of sentence and place the youth on probation. 18 U.S.C. § 5010(a). The second allows the court to sentence the youth offender, in lieu of imprisonment under other applicable provisions of law, to the custody of the Attorney General for treatment and supervision. 18 U.S.C. § 5010(b). Under this alternative, the youth offender must be unconditionally discharged no later than six years after the date of his conviction. 18 U.S.C. § 5017(c). The third alternative allows the court to sentence the offender to a youth institution while specifying the term, which may exceed six years but may not exceed the maximum period authorized by law for any applicable penalty. 18 U.S.C. §§ 5010(c), 5017(d). Under the last alternative, the court, if it finds "that the youth offender will not derive benefit from treatment under subsection (b) or (c)," may sentence the youth offender "under any other applicable penalty provision." 18 U.S.C. § 5010(d).

5. His stated reason for suggesting a federal institution designation was that while appellant's needs were long-term the Lorton Youth Center is a short-term facility. See, infra, 174 U.S.App.D.C. pp. ——————, 531 F.2d pp. 582–583.

tion of transfer to a federal center, finding it "not . . . possible," and recommended adult sentencing.[6]

The trial court on January 30, 1973, sentenced Hopkins to a term of imprisonment of 5 to 15 years.[7] In imposing this sentence the court stated:

. . . Well, let the record indicate that the Court did ask for a 5010(e) evaluation in view of the age, 19 years, of the defendant and received conflicting evaluations. One group, the Board of Parole, recommended that the Court impose sentence by way of the adult sentencing procedures. The Department of Corrections, without making a recommendation, said they would concur in a 5010(c) commitment; otherwise, they wouldn't, as an adult [sic], recommend it.

I have given a great deal of thought to that report and evaluation and the probation report which indicates that although he is only 19, this defendant has been the subject of criminal investigations since the age of 12 continuously. He has been charged as a youth since the age of 12, 13, 14, 15, 16, 17, right up to the age of 19 when he was involved in what was originally charged as a felony murder, and he has been permitted to plead to a broken-down manslaughter charge.

In view of all that past record and the various recommendations, I am going to sentence him to a period of not less than five nor more than fifteen years as an adult on the manslaughter charge.[8]

Appellant noted this appeal after several motions for post-conviction relief were denied by the district court.[9] The only issue confronting this court is whether *Dorszynski v. United States*[10] bars review of the court's denial of FYCA sentencing. In the circumstances of this case, we believe that it does not and that the case should be remanded so that the District Court may conduct further proceedings consistent with this opinion.

With reference to the "general proposition that once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end"[11] and the principle that "limited review [of the exercise of sentencing discretion] is available when sentencing discretion is not exercised at all,"[12] the Court in *Dorszynski* held that the trial court must explicitly make a "no benefit" finding before sentencing a youth offender as an adult.

An explicit finding that the youth would not benefit from treatment, the Court reasoned, would remove all doubt concerning whether the sentencing court actually exercised its discretion under the Act.[13] Notwithstanding its narrow interpretation of the congressional purposes in enacting the FYCA, and its observations concerning the virtually "unfettered" discretion of sentenc-

6. For an expanded analysis of the Parole Board's recommendation see *infra*, pp. ——— ———, 531 F.2d pp. 582–583.

7. The maximum term authorized under 22 D.C. Code § 2405 is 15 years.

8. Sentencing Hearing Transcript pp. 3–4.

9. On March 7, 1973 appellant filed a *pro se* "motion to correct illegal sentence" pursuant to 28 U.S.C. § 2255 and Rule 35 of the Federal Rules of Criminal Procedure. This motion was denied two days later. On March 23, 1973 appellant filed another *pro se* motion, this one for "reduction in sentence" under 18 U.S.C. § 4082. On that same day, counsel filed a motion under Fed.R.Cr.Pro., Rule 35. These latter two motions were denied that same day, and appellant noted his appeal on April 3, 1973.

10. 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

11. *Id.* at 431, 94 S.Ct. at 3047 [footnote omitted], *citing Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *Blockburger v. United States*, 284 U.S. 299, 305, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

12. *Dorszynski, supra*, n. 10, 418 U.S. at 443, 94 S.Ct. at 3052, *citing Yates v. United States*, 356 U.S. 363, 366–367, 78 S.Ct. 766, 2 L.Ed.2d 837 (1958); *United States v. Daniels,* 446 F.2d 967, 972 (6th Cir. 1971); *United States v. Williams,* 407 F.2d 940, 945 (4th Cir. 1969).

13. *Dorszynski, supra*, n. 10, 418 U.S. at 444, 94 S.Ct. 3042.

ing judges, the Court refused to allow the no benefit finding to be left to implication. "Literal compliance with the Act," the Court stated, "can be satisfied by any expression that makes clear the sentencing judge considered the alternative of sentencing under the Act *and* decided that the youth offender would not derive benefit from treatment under the Act." [14]

The district judge in the instant case clearly considered FYCA sentencing. As is indicated by the use of the conjunctive in the above quoted passage, however, explicit consideration of youth sentencing alone is inadequate. That the youth before the sentencing court would "not derive benefit from treatment under the Act" [15] also must explicitly be established. Only by requiring such an explicit finding can consideration of the *one factor* deemed relevant to FYCA sentencing by Congress itself—amenability to treatment—be assured. The requirement of an express finding of no benefit ensures not only that the sentencing court is aware of the FYCA, but also that it focused on amenability to treatment in making its sentencing determination.[16] The wisdom of this approach may be best illustrated by example. In *United States v. Van Buren* [17] we remanded for resentencing because the trial judge failed to make an explicit no benefit finding, although he did

rely on a host of negative findings in the § 5010(e) report in denying FYCA sentencing. On remand the same trial judge—unable to make that finding—sentenced Van Buren to a Youth Act term.

The circumstances in the instant case similarly compel the conclusion that we must remand for the explicit no benefit finding *Dorszynski* requires.[18]

The extent to which further appellate exploration of the deficiencies in the sentencing process is permissible has been constricted by the Supreme Court's opinion in *Dorszynski*. The Court held that the "no benefit" finding required under § 5010(d) "is not to be read as a substantive standard which must be satisfied to support a sentence outside the Act" and that a sentence outside the Act "need not be accompanied by a statement of reasons why the court chose such a sentence." [19]

The Court in *Dorszynski*, however, was careful to point out that appellate courts do have a limited role to play in the sentencing area. By citing *United States v. Tucker*,[20] and noting that appellant had not contended that "the District Court relied upon improper or inaccurate information," the Court reaffirmed the principle that appellate courts have a duty to scrutinize sentencing decisions to insure that they are not

---

14. *Id.* (emphasis added).

15. *Id.*

16. *See United States v. Dancy*, 166 U.S.App. D.C. 399, 510 F.2d 779, n. 33, 785 (1975), noting the "shortcoming" in the sentencing proceeding occasioned by the failure of the trial court to explicitly find no benefit.

17. No. 72–1605 (D.C.Cir., Oct. 2, 1974) (unreported).

18. An explicit no benefit finding alone was found insufficient to satisfy the statutory requirement by the four justices who joined in a separate opinion concurring in the result reached by the majority in *Dorszynski*. The concurring justices would have required that the explicit "no benefit" finding be augmented by a statement of the reasons for imposing an adult sentence. *Dorszysnki, supra*, n. 10, 418 U.S. at 446, 94 S.Ct. 3042 (concurring opinion).

See also the D.C. Circuit cases cited *infra*, n. 19.

19. *Dorszynski, supra*, n. 10 at 441, 94 S.Ct. at 3052.

Prior to *Dorszynski* this court had required that a statement of reasons accompany a trial judge's finding of "no benefit." *United States v. Reed*, 155 U.S.App.D.C. 198, 476 F.2d 1145, 1149–50 (1973) (en banc); *United States v. Coefield*, 155 U.S.App.D.C. 205, 476 F.2d 1152, 1157 (1973) (en banc). Appellate examination of the "rationality of those factors [which informed and shaped the sentencing judge's exercise of discretion] in relation to Congressional objectives," *United States v. Phillips*, 156 U.S. App.D.C. 217, 219, 479 F.2d 1200, 1202 (1973); *United States v. Reed, supra*, at 1150, was deemed by this court to be an essential step in the process of administering the FYCA.

20. 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

based on improper or unreliable information.[21]

The Court in *Dorszynski* also distinguished between "appellate modification of a statutorily-authorized sentence"[22] and "careful scrutiny of the *judicial process* by which the particular punishment was determined."[23] Rather than being an "unjustified incursion into the province of the sentencing judge," the Court observed that this latter responsibility is "a necessary incident of what has always been appropriate appellate review of criminal cases."[24] Its aim is to guarantee that the trial judge's discretion actually has been exercised,[25] and that the information relied on in sentencing is not unreliable,[26] improper,[27] or grossly insufficient.[28]

■ An examination of the documents that served as a foundation for the punishment imposed in this case, undertaken in the performance of this duty to scrutinize the judicial process, reveals flaws fatal to the kind of knowledgeable sentencing called for by an act as carefully engineered as the FYCA. The FYCA reflects the Congressional mandate to substitute rehabilitation for retribution in the sentencing of young offenders.[29] As the Supreme Court noted, there were

two principal motivating factors behind the enactment of the Act: first, the period of life between 16 and 22 years of age was found to be the time when special factors operated to produce habitual criminals. Second, then-existing methods of treating criminally inclined youths were found inadequate in avoiding recidivism. H.R.Rep.No.2979, 81st Cong., 2d Sess., 2–3 (1950) (hereinafter H.R. 2979). The Act was thus designed to provide a better method for treating young offenders convicted in federal courts in that

21. *Dorszynski, supra*, n. 10, 418 U.S. at 431, n. 7, 94 S.Ct. 3042.

22. *Id.* at 443, 94 S.Ct. at 3053, *quoting* from *United States v. Hartford*, 489 F.2d 652, 654 (5th Cir. 1974).

23. *Id.* (emphasis in original).

24. *Id. See, e. g., Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), *reh. denied*, 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760 (1949), *reh. denied*, 338 U.S. 841, 70 S.Ct. 34, 94 L.Ed. 514 (1949); *Townsend v. Burke, supra*, n. 11.

25. *See Yates v. United States, supra*, n. 12, 356 U.S. at 366–367, 78 S.Ct. [766] at 768–769, a contempt case, in which the Supreme Court undertook not only to review the severity of the sentence imposed by the district court, but also to set it aside in favor of its own sentence. The Court noted that while "reduction of the sentence" normally "should be left, on remand, to the sentencing court," in a situation "like this [where] the District Court appears not to have exercised its discretion in the light of the reversal of the judgment but, in effect, to have sought merely to justify the original sentence, this Court has no alternative except to exercise its supervisory power over the administration of justice . . . by setting aside the sentence . . .." The Court further expressed its view that "the time that petitioner has already served in jail is an adequate punishment," and remanded to the District Court with instructions to reduce the sentence accordingly.

See also *United States v. Dancy, supra*, n. 16; *United States v. Hartford, supra*, n. 22; *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973); *United States v. Charles*, 460 F.2d 1093 (6th Cir. 1972); *United States v. Daniels*, 446 F.2d 967 (6th Cir. 1971); *United States v. McCoy*, 139 U.S.App.D.C. 60, 429 F.2d 739 (1970); *Briscoe v. United States*, 129 U.S.App. D.C. 146, 391 F.2d 984 (1968).

26. *Townsend v. Burke, supra*, n. 11.

27. *United States v. Tucker, supra*, n. 20; *McGee v. United States*, 462 F.2d 243 (2d Cir. 1972); *Scott v. United States*, 135 U.S.App. D.C. 377, 419 F.2d 264 (1969); *Coleman v. United States*, 123 U.S.App.D.C. 103, 357 F.2d 563 (1963) (en banc).

28. *See Leach v. United States*, 118 U.S.App. D.C. 197, 334 F.2d 945 (1964); *Jones v. United States*, 117 U.S.App.D.C. 169, 327 F.2d 867 (1963) (en banc); *Peters v. United States*, 113 U.S.App.D.C. 236, 307 F.2d 193 (1962) (per curiam). *And see* ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences § 3.2(ii) (1968) ("The authority of the reviewing court with respect to the sentence should specifically extend to review of . . . the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based.").

29. H.R.Rep.No.2979, 81st Cong., 2d Sess. (1950). 1950 U.S.Code Cong., Serv., p. 3983.

vulnerable age bracket, to rehabilitate them and restore normal behavior patterns. *Ibid.*[30]

As a sentencing statute, the Act is unparalleled in its comprehensiveness. In addition to the four alternative sentences that may be imposed,[31] there are numerous other special provisions emphasizing the distinctive character of the sentencing of a youth offender.[32] A new Youth Correction Division was created within the United States Board of Parole to implement the system.[33] There are elaborate procedures for the study, classification and periodic examination of committed youths,[34] and detailed provisions governing conditional and unconditional release of offenders and procedures for supervising those released.[35]

As part of this elaborate scheme Congress provided for the preparation of § 5010(e) reports, designed to supply "additional information as to whether [the] youth offender will derive benefit from treatment."[36]

The observation and study period furnishes an invaluable opportunity to discover why these youths committed crimes, whether and in what way society has failed them, and what might be done to foster productive, law-abiding conduct in the future. The reports prepared are potentially useful presentencing aids to assist the judge in discharging his awesome responsibilities under the Act.

Hearings held by the District Court, however, have revealed serious procedural and substantive problems in the § 5010(e) process at the Lorton Youth Center which impede the preparation of the type of thorough and knowledgeable reports courts require to exercise their FYCA responsibilities. The information concerning the disturbing defects in the conduct of § 5010(e) studies generated at these hearings in *United States v. Norcome*[37] and *United States v. Tillman*[38] raises the possibility that the deficiencies[39] are systemwide, affecting all § 5010(e) studies.[40]

---

**30.** *Dorszynski, supra,* n. 10, 418 U.S. at 432–3, 94 S.Ct. [3042] at 3047–3048. The motivations behind enactment of the FYCA and a detailed sketch of its legislative history appear in *Dorszynski* and *United States v. Coefield, supra,* n. 19, and will not be repeated at length here.

**31.** *Supra,* n. 4.

**32.** *United States v. Coefield, supra,* n. 19, at 1156.

**33.** 18 U.S.C. § 5005. The Division functions under the Attorney General and in collaboration with the Director of the Bureau of Prisons. 18 U.S.C. §§ 5005, 5007.

**34.** 18 U.S.C. §§ 5014–16.

**35.** 18 U.S.C. §§ 5017, 5019. See Note, "Sentencing under the Federal Youth Corrections Act: The Need for an Explicit Finding and a Statement of Reasons," 53 *B.U.L.Rev.* 1071, 1078 (1973).

**36.** 18 U.S.C. § 5010(e). *See* n. 2, *supra.*

**37.** 375 F.Supp. 270 (D.D.C.1974), (District Court hearings conducted on February 11–12, 1974 and March 21, 1974).

**38.** 374 F.Supp. 215 (D.D.C.1974) (District Court hearings conducted on December 28, 1973 and January 2, 1974). As in *United States v. Dancy, supra,* n. 16 at 787, our responsibility to scrutinize the judicial process by which punish-

ment is determined, *Dorszynski, supra,* n. 10, 418 U.S. at 443, 94 S.Ct. 3042, and to ensure that the trial judge has considered the information available with some regard for its reliability, *Scott v. United States, supra,* n. 27 at 266, compels us to take judicial notice of these hearings. To ignore *Norcome* and *Tillman* would be "another act of that 'blind court' that does not see what 'all others can see and understand.' *United States v. Rumely,* 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953)." *United States v. Dancy, supra,* n. 16 at 787, n. 43.

**39.** Among the deficiencies revealed in the *Norcome* and *Tillman* proceedings were the following:

(1) A lack of understanding of the goals and substance of the FYCA and the scope of its sentencing alternatives by Lorton Youth Center personnel;

(2) a failure by Youth Center personnel to use any uniform criteria for making sentencing recommendations;

(3) use by Youth Center personnel of vague and conclusory terms to justify adult sentence recommendations;

(4) procedures followed in preparing § 5010(e) studies that create the risk of shielding the sentencing judge from dissenting views of diagnostic personnel;

(5) false information, upon which the Classification Committee relied in recommending an

**40.** Note 40 on p. 582.

The record in this case similarly reveals deficiencies that denied the trial judge the type of information to which he is entitled under the Act—information that would enable him to make a knowledgeable sentencing determination. The inconsistent, conflicting and conclusory information appearing on this record raises serious questions as to its reliability. We believe that evidence of such patent unreliability itself may warrant that the record be remanded for further inquiry into the accuracy of the information in the § 5010(e) report. A remand for this purpose would in no way interfere with the district judge's sentencing discretion. We need not decide the issue here, however, because we are remanding for an explicit no benefit finding. On remand the District Court may consider the need for a detailed explanation of Hopkins' § 5010(e) report, its supplementation with further information, and/or an inquiry into the manner in which the study was conducted.[41]

The inherent weaknesses and contradictions in Hopkins' § 5010(e) report may be best illustrated by example. In his cover letter to the D. C. Parole Board which accompanied the Classification Committee's evaluation and recommendation, the Superintendent of Lorton Youth Center stated:

> This is a short term institution and this youth needs [sic] are deemed to be long term. If a federal institution can be designated I would concur with a Youth Corrections Act, 5010(c) commitment, otherwise commitment as an adult is recommended.

The Parole Board recommended adult sentencing, observing not that Hopkins would not benefit from FYCA treatment,[42] but

---

adult sentence, in Norcome's § 5010(e) report; and

(6) use of psychological tests that have not been validated empirically with respect to measuring capacity to benefit from FYCA programs.

For a more detailed analysis of these defects, *see United States v. Dancy, supra,* n. 16 at 788–790.

**40.** The trial judges in *Norcome* and *Tillman* apparently did not perceive the § 5010(e) process problems as being confined to the particular cases before them. In *Norcome* the trial judge found that "[t]he record of the hearing reflects administrative practices in the diagnostic examination of youth offenders that border on extreme governmental dereliction of Congressionally-mandated responsibilities under the Act." *United States v. Norcome, supra,* n. 37 at 274. He concluded that as a result, "courts are receiving inaccurate, erroneous and wholly misleading § 5010(e) reports and recommendations." *Id.* at 275.

The district court judge in *Tillman* observed that the reports, testimony, and responses to the court's questionnaire "demonstrate that the § 5010(e) study and observation process at the Lorton Youth Center is marred by a lack of understanding of the kind of information which the courts need to make informed and proper YCA sentencing judgments," and that as a result of the deficiencies, "many eligible youth offenders . . . may have been improperly denied YCA treatment and the possibility of rehabilitation, to the benefit of neither themselves nor society." *United States v. Tillman, supra,* n. 38 at 226–227 (footnote omitted).

**41.** *See United States v. Dancy, supra,* n. 16 at 787. *And see Dorszynski, supra,* n. 10 ("Thus, where a trial judge secures a § 5010(e) report, he should adopt its reasons as his own only after assuring himself of the adequacy of the report and propriety of its recommendation.") (concurring opinion, 418 U.S. at 459, 94 S.Ct. at 3060) (footnote omitted).

**42.** In commenting on Hopkins' possible amenability to treatment, the Board concluded that "at best, he would be marginal and the Board questions his ability to respond in light of the programs available when his well developed street-wise orientation is noted." Aside from the factually questionable assertion that Hopkins has "well developed street-wise orientation," *infra,* 174 U.S.App.D.C. p. ——, 531 F.2d p. 583, this quotation falls far short of any indication that in the Board's opinion appellant would not benefit from FYCA sentencing. The Board went on to note that Hopkins' background was one of deprivation, that he had "an extensive history of aggressive assaultive type acting out," that the efforts of juvenile and social agencies to provide "corrective assistance" had been unavailing, and that Hopkins' "self-control even in his structured setting [during the § 5010(e) observation period at the Youth Center] is marginal." These reflections, also of questionable reliability, *infra,* 174 U.S. App.D.C.p:——,531 F.2d pp. 583–584 prompted the Board to conclude "that [Hopkins'] needs require more help than the Youth Center can provide him with." The inability of Lorton Youth Center to provide the treatment contemplated by the FYCA is an inadequate legal basis

rather that the alternative of transfer to a federal center "is not felt to be possible." [43]

The reference to appellant's long-term needs and the recommendation of transfer or adult sentencing in light of the characterization of the Lorton Youth Center as a "short term institution," suggests that those for whom long commitments are contemplated are inappropriate for FYCA sentencing. This is directly contrary to the clear language of the Act, which provides for youth sentences of both short and long duration.[44] Nothing in the Act designates Lorton Youth Center as a short-term facility nor suggests that its possible existence as such justifies denying youths FYCA sentencing. The distinction between eligibility for, and the benefit possible from FYCA sentencing, and the availability of resources is thus obliterated.[45] And while the prob-

lem of overcrowding at Lorton that has more than once in the past been noted by the courts to be an inappropriate basis for adult sentencing [46] is alluded to, there is no indication of what, if any, consideration was given to the availability of space at other federal youth centers.[47]

There are other aspects of the § 5010(e) report that merit comment. As has been mentioned,[48] the Parole Board questioned Hopkins' "ability to respond in light of the programs available when his well developed street-wise orientation is noted." The Classification Committee's clinical psychologist, on the other hand, expressly stated that "while [Hopkins] has been around the fringes of criminal activities most of his life, he has little sophistication neither [sic] into its techniques nor orientation." [49] And while the Parole Board spoke of Hopkins'

for denial of youth sentencing. *United States v. Tillman, supra,* n. 38 at 223.

**43.** These remarks by the Superintendent and the Parole Board are not the only references to transfer. The clinical psychologist similarly recommended transfer, but his reason for so doing was that while at the Lorton Youth Center Hopkins' relationships with his co-defendant and his companions were "somewhat strained," a situation labeled potentially "explosive." Our records reveal that appellant's co-defendant is now serving his sentence in Lompoc, California, rather than at Lorton.

**44.** If sentenced under 18 U.S.C. § 5010(b), a young offender must be unconditionally discharged no later than six years after the date of his conviction. 18 U.S.C. § 5017(c). If 18 U.S.C. § 5010(c) is invoked by the trial judge, the six year ceiling does not apply and unconditional discharge can occur any time up to "the expiration of the maximum sentence imposed, computed uninterruptedly from the date of conviction." 18 U.S.C. § 5017(d). *See United States v. Coefield, supra,* n. 19 at 1160.

**45.** *See United States v. Norcome, supra,* n. 37 at 280. ("If the economic cost is too great for Congress to expend in making the Youth Act a reality, then that is for Congress to decide. This Court cannot be a party to a 'coverup' of the Act's short-comings that denies eligible youths the opportunity afforded them under the Act to respond beneficially to treatment, have their records expunged and move into a healthy and productive life in society.") *See also United States v. Alsbrook,* 336 F.Supp. 973 (D.D.C.1971).

**46.** *See, e. g., United States v. Riley,* 157 U.S. App.D.C. 27, 481 F.2d 1127 (1973); *United States v. Norcome, supra,* n. 37; *United States v. Tillman, supra,* n. 38; *United States v. Alsbrook, supra,* n. 45. *Cf. United States v. Allen,* 166 U.S.App.D.C. 271, 510 F.2d 651 (1974).

**47.** Under 18 U.S.C. § 5025(a) (1970) the Commissioner of the District of Columbia is authorized to provide facilities for local offenders, or "to contract with the Director of the Bureau of Prisons for their treatment and rehabilitation, the cost of which may be paid from the appropriation for the District of Columbia."

In *United States v. Riley, supra,* n. 46, counsel advised the court that as of March 3, 1972 at least four other federal youth centers had space available for additional FYCA commitments.

**48.** *Supra,* n. 42.

**49.** It is the function of the clinical psychologist to compile a personality profile of the offender, based on interviews with him and certain projective and intelligence tests. This profile, along with the Classification Committee's joint evaluation and recommendation, the Classification and Parole Officer's separate report, and the cover letter from the Superintendent or Assistant Director of the Youth Center, is sent to the D.C. Board of Parole. The Board then makes its own recommendation, based on this material, rather than on any independent examination of the youth offender. *United States v. Dancy, supra,* n. 16 at 783.

inability to handle authority and to curb his hostility, concluding that "self-control even in his structured setting is marginal," the clinical psychologist observed that "generally speaking, he should not be a serious disciplinary problem since he will passively comply with what is expected of him." [50]

50. Although there was no apparent consensus as to whether Hopkins is "passive" or "aggressive," there was complete agreement on one point. The Parole Board summarized this in saying: "This individual is a product of social, emotional and educational instability and deprivation." The records reveal that appellant was the third of seven children born to parents who could offer them very little, and that he grew up in an atmosphere of economic, social and cultural deprivation and of constant friction. According to the Classification Committee Study, appellant's mother was hospitalized in 1964 or 1965 for three months with severe injuries after having been thrown out of the window by her common-law husband. During this time the children were placed in Junior Village, and appellant's mother had to go on Public Assistance. (In view of this, appellant's comment noted in the Classification Study that he had "very hostile feelings towards his father" since "he [had] never done anything for him" seems anything but remarkable.)

Hopkins first became known to the correctional authorities at the age of 12, when his mother charged him as being "Beyond Control." His 77 IQ places appellant in the "dull range of intelligence," and he was described as a "weak and ineffectual person" with a "poor self-image," who although "approachable" is "cautious with others until they prove that they will not hurt him." The Classification Committee characterized appellant as having poor self-image because he viewed himself as "dumb and stupid," but also noted that appellant's mother herself constantly referred to appellant as being "dumb and stupid."

Commenting once before on this sort of troubled past that often brings youngsters before the courts, I stated in one opinion:

. . . Many of these children need, above all, a stable home such as they have never enjoyed. They need parents, or what may be more heartbreaking, they need better parents. This the court can never hope to provide. Less pardonably, it too often cannot even provide a surrogate that offers some hope to reclaim the youth. Many of these juveniles have grown to an embittered adolescence amidst the frustration of the ghetto. *Haziel v. United States,* 131 U.S.App.D.C. 298, 299, 404 F.2d 1275, 1279 (1968) (footnote omitted).

Unfortunately, appellant's distressing past cannot be changed. The only hope for him lies in the future. Perhaps education assistance,

A FYCA sentence may be society's last hope for rescuing a young offender from a nascent life of crime. The Act represents the one opportunity Congress has given young offenders to redirect their energies into law-abiding and productive activities.[51]

counseling, or vocational training could provide such hope. The Classification Committee surely thought so. It stated that appellant "has the potential to develop some basic skills, hence improving upon his very poor self-image," and recommended that he be placed in the Youth Center's school, in the electrical repair shop, where appellant could put his training and interest to use. The clinical psychologist reported that appellant "appears to be motivated to achieve some degree of proficiency in the basic concepts provided in a remedial program."

51. The failures of our rehabilitative efforts in curbing recidivism have been documented in a spate of recent articles. For a particularly comprehensive review of the evaluative literature, *see* Robert Martinson, "What Works?— Questions and Answers about Prison Reform," 12 *Public Interest* 22 (1974). For additional material *see* Stuart Adams, "Evaluative Research in Corrections: Status and Prospects," 38 *Fed.Prob.* 14 (1974); Martin Gold, "A Time for Skepticism," 20 *Cr. & Delinq.* 20 (1974); John Conrad, "Corrections and Simple Justice," 64 *J.Crim.Law & Criminology* 208 (1973); Nora Klapmuts, "Community Alternatives to Prison," 5 *Cr. & Delinq.Lit.* 305 (1973); David Greenberg, "A Voucher System for Correction," 19 *Cr. & Delinq.* 212 (1973); G. Kessebaum, D. Ward and D. Wilner, *Prison Treatment and Parole Survival* (1971); J. Robison and G. Smith, "The Effectiveness of Correctional Programs," 17 *Cr. & Delinq.* 67 (1971).

The lack of success we have had in rehabilitating offenders that is indicated by the studies cannot be ignored. The conclusions of those who have critically examined programs implemented during the rise of the era of the "rehabilitative ideal" with regard to their efficacy in reducing recidivism and tendency to be used to justify substantial encroachments on liberty should be carefully considered in our rethinking of the intended goals of our system of criminal justice. Although one cannot help but be disillusioned by such failures, it is important not to give up all hope. These failures may be attributable, at least in part, to the dearth of resources committed to making rehabilitative programs in institutions work, and the often haphazard manner by which such programs are implemented. *Supra,* 174 U.S.App.D.C. pp. ———— ——, 531 F.2d pp. 581–582. Perhaps any attempt to rehabilitate those who have never been habilitated—the unfortunate individuals from deprived backgrounds com-

The administration of the FYCA, however, at least in the District of Columbia, has been anything but reflective of these legislative goals. Lack of resources and skilled personnel, overcrowding in the Youth Corrections Center, and confusion as to who qualifies under the Act by correctional officials and judges alike, have successfully prevented achievement of the Act's purposes. Although courts in the District repeatedly have criticized the way in which the Act has been implemented, improvement has not been forthcoming.

We must remain vigilant in exposing, rather than concealing, these problems. Should we not, the charade of compliance with the Act will be perpetuated. "If we take the FYCA seriously—as we must—the sentencing process must be conducted in a manner far more in keeping with the critical nature of its potential consequences." [52]

Accordingly, this case will be remanded to the district court for an explicit determination of whether appellant would derive benefit from FYCA treatment, and, in that connection, for reconsideration of the sentence in light of the present record, supplemented as may be necessary by reason of the deficiencies and inconsistencies of the § 5010(e) report that are pointed out in this opinion.

ROBB, Circuit Judge (concurring in part and dissenting in part):

Since the District Court did not make an explicit finding that Hopkins would not benefit from sentencing as a youth offender I acquiesce in the remand. *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). I do not concur in the part of the majority opinion which examines and evaluates the reports and infor-

mation which were before the sentencing judge, and directs him to reconsider the sentence.

Apparently dissatisfied with the reasoning of the district judge and the sentence he imposed the majority directs him to reconsider. In my opinion this direction and the justification for it advanced by the majority are unwarranted attempts to escape the narrow limitations placed on appellate review of sentences by the *Dorszynski* decision. I cannot approve such an intrusion into the exclusive discretionary power of the district judge. "Once it is made clear that the sentencing judge has considered the option of treatment under the Act and rejected it . . . no appellate review is warranted." *Dorszynski v. United States* at 443, 94 S.Ct. at 3053.

---

prising the majority of those who pass through the revolving doors of our criminal justice system—is doomed to failure.

These are weighty problems that must be reckoned with, but an expanded discourse on such matters is beyond the scope of this opinion. The important point here is that *despite* the validity of criticisms of the rehabilitative movement in penology, the FYCA nevertheless embodies the will of Congress to opt for providing rehabilitative opportunities for young of-

fenders. *Dorszynski, supra,* n. 10, 418 U.S. at 448, n. 8, 94 S.Ct. 3042 (concurring opinion). FYCA sentencing is the only real alternative to traditional incarceration that has been provided, and there is no justification for negating the avowed intent of the Congress that passed this comprehensive statutory scheme to reclaim youthful offenders.

**52.** *United States v. Dancy, supra,* n. 16 at 790.